EDWIN A. LOMBARD, Judge.
hThe defendant, Darrill M. Henry, challenges his convictions on two counts of first degree murder, arguing that he is factually innocent, that the suggestive and unreliable witness identifications should have been suppressed, and that Brady [v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)] violations occurred. After review of the record in light of the applicable law and arguments of the parties, his conviction is affirmed.

*1146
Relevant Procedural and Factual History

On June 15, 2004, at approximately 1:30 p.m., eighty-nine year old Durelli Watts and her sixty-seven year old daughter, Ina Gex, were brutally murdered in Ms. Watts’ Gentilly home at 1930 Duels Street. After stabbing Ms. Watts fourteen times, the perpetrator set her body and the house on fire. Before he could leave the house, Ms. Gex arrived to check on her mother. The perpetrator shot Ms. Gex three times as she stood on the porch and, after rummaging through her purse, shot her a fourth time in the head. He then walked away from the house and down the street. Three of Ms. Watts’ neighbors witnessed the shooting. They removed Ms. Gex from the porch but were unable to assist Ms. Watts because the residence was engulfed in flames.
|2The defendant was indicted on September 2, 2004, charged with two counts of murder in violation of La.Rev.Stat. 14:30. At his arraignment on September 9, 2004, he pleaded not guilty. The defendant’s motions to suppress the statements and identifications were denied and his trial commenced on August 23, 2011. On August 31, 2011, the jury unanimously found him guilty on both counts. During the penalty phase, the jury recommended a life sentence and on May 24, 2012, the trial judge sentenced the defendant to life imprisonment without benefit of parole, probation or suspension of sentence on both counts. This appeal follows.

Errors Patent

A review of the record for errors patent reveals none.

Assignment of Error 1

Appellate counsel argues that the defendant is innocent and that the charges against him were based upon neighborhood gossip without supporting evidence or forensics. In addition, appellate counsel asserts that the State failed to prove the defendant was correctly identified as the perpetrator.

Applicable Law

Counsel’s argument misapprehends appellate jurisdiction. It is axiomatic that the factfinder determines factual guilt or innocence; an appellate court determines whether the evidence is constitutionally sufficient in accordance with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Accordingly, we can only view the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Although we consider the record as a whole, State v. Mussall, 523 So.2d 1305 (La.1988), this court cannot be “called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” | ^State v. Smith, 600 So.2d 1319, 1324 (La.1992); see also State v. Spears, 05-0964, p. 3 (La.4/4/06), 929 So.2d 1219, 1222 (constitutional law does not require the reviewing court to determine whether it believes the witnesses or whether it believes that the evidence establishes guilt beyond a reasonable doubt; the factfinder is given much discretion in determinations of credibility and evidence, and the reviewing court will only impinge on this discretion to the extent necessary to guarantee the fundamental protection of due process of law); State v. Hearold, 603 So.2d 731, 734 (La.1992) (the entirety of the evidence, whether properly or improperly admitted, is to be considered by the reviewing court when assessing a conviction for sufficiency of the evidence).
La.Rev.Stat. 14:30 defines first degree murder as the killing of a human being:
(1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or
*1147 attempted perpetration of aggravated arson ... or the perpetration or attempted perpetration of armed robbery. ...
[[Image here]]
(3) When the offender has a specific intent to kill or to inflict great bodily harm upon more than one person.
[[Image here]]
(5) When the offender has the specific intent to kill or to inflict great bodily harm upon a victim who is ... sixty-five years of age or older.
The State bears of the burden of proving those elements, along with the burden to prove the identity of the defendant as the perpetrator. State v. Draughn, 2005-1825, p. 7 (La.1/17/07), 950 So.2d 583. “Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La.Rev.Stat. 14:10(1). It “may be inferred from the circumstances surrounding the offense and the conduct of the defendant.” Draughn, 05-1825 at pp. 7-8, 950 |4So.2d at 592-93. Additionally, specific intent “may be formed in an instant.” State v. Wright, 01-0322, p. 11 (La.12/4/02), 834 So.2d 974, 984.
In this case, no forensic evidence links the defendant to the victims or to the crimes, only eyewitness testimony and the defendant disputes the trustworthiness of that evidence. When identity is disputed, the State must negate any reasonable probability of misidentification. State v. Everett, 11-0714, p. 15 (La.App. 4 Cir. 6/13/12), 96 So.3d 605, 619, writs denied, 12-1593, 12-1610 (La.2/8/13), 108 So.3d 77.
The following evidence was adduced at trial.
Communications Supervisor Giselle Roussel of the New Orleans Police Department (NOPD) identified the incident recall number F-25354-04 and the recording of the 911 calls relative to this case. The calls were played for the jury and Officer Roussel noted that the first 911 call was received at 1:54 p.m. on June 15, 2004. The callers stated that the perpetrator was wearing a red t-shirt and blue pants.
Ms. Cecilia Garcia testified that at the time of the murder she lived at 1933 Duels Street and often saw Ms. Watts sitting on her front porch across the street. On June 15, 2004, Ms. Garcia was talking on the telephone in her kitchen at about 1:30 p.m. when she heard what sounded like a pebble hitting her house. She went to the front of her house and saw a man standing on Ms. Watts’ front porch. She noticed a woman in a prone position on the porch and, after retrieving her cell phone, went outside. She did not recognize the man who walked away from the porch towards the Dominick house (her neighbors to the right) as she walked towards Ms. Watts’ porch. They passed each other on the street and, according to Ms. Garcia, the man walked in a leisurely manner, as if “taking a Sunday stroll or | ^something,” and was wearing a floppy “Gilligan” hat that “shadowed his face some,” blue pants, and a red t-shirt. Ms. Garcia unequivocally identified the defendant in court as the man she saw walking away from Ms. Watts’ residence. She stated that he was about 5'8" with medium build but appeared heavier in court than he had on the day of the murders.
Other neighbors came out of their houses and several carried the body from the porch as the police and fire department sirens drew close. When the firemen arrived, Ms. Garcia and her neighbors alerted them to the fact that Ms. Watts was still in the house and they pulled her out, her pants singed from the fire. Ms. Garcia stayed at her mother’s house that evening and, after seeing a sketch of the *1148 perpetrator on television which she thought was incorrect, directed her husband in drawing a more accurate sketch. She subsequently gave that sketch to the police. On July 7, 2004, Ms. Garcia identified the defendant in a six-person photo lineup as the man she saw walking from Ms. Watts’ porch on June 15, 2004.
Steven Dominick testified that he grew up in his parents’ home at 1937-39 Duels Street (directly across the street from Ms. Watts’ residence) and, accordingly, had known Ms. Watts his entire life. He was at his parents’ house on June 15, 2004, when, at approximately 1:00 p.m., he heard gunshots emanating from across the street. Accordingly, Mr. Dominick walked to the picture window in the front of the house and -witnessed Ms. Gex fall on the porch of Ms. Watts’ house. As he stepped out of the house, he witnessed a man put a gun to Ms. Gex’s head and fire another shot. The shooter casually walked from the scene toward the corner of Annette and Duels Streets and Mr. Dominick, monitoring the shooter’s movements from inside the house, called 911. Then he went outside and, as he walked towards Ms. Watts’ house, he realized that it was on fire. Ms. Gex’s head Rmoved and, as the police and firemen arrived, he and two neighbors carried her away from the burning house. He and his neighbors then turned their attention Ms. Watts but the police would not let them enter the burning house. Instead, the police transported him and one other neighbor, who also witnessed the event, to the Fifth District Station for questioning.
Mr. Dominick described the shooter as having a medium brown complexion, small twists in his hair and clean shaven. He said the perpetrator wore a red shirt, blue jeans/pants and a canvas hat. The day after the incident, a police artist drew a sketch of the shooter with Mr. Dominick’s direction. Although the police showed him with at least two photographic lineups, Mr. Dominick was unable to make a positive identification from either lineup. On July 17, 2010, however, Mr. Dominick was in jail on pending charges and placed in the same holding cell as the defendant who was also awaiting a court hearing. He recognized the defendant as the man who shot Ms. Gex and, after alerting deputies that he feared for his safety, Mr. Dominick was placed in a tier separate from the defendant.
On cross-examination, Mr. Dominick confirmed that he made a 911 call, gave a taped statement to the police, met with a sketch artist, viewed two photographic lineups, and testified before the Orleans Parish Grand Jury. In addition, he stated that he noticed the defendant carrying a gun as he left Ms. Watts’ residence. On further cross-examination, Mr. Dominick conceded that he had been charged with 139 counts of pornography involving children [1] and also that 17he had pleaded guilty to five counts of forcible rape, six counts of stalking, three counts of extortion and one count of second-degree kidnapping.[2]
Ms. Linda Gex Davis testified that she lived on Duels Street from 1965 to 2005 and had known Ms. Watts for many years. On June 15, 2004, she walked outside her house to her car to retrieve something from the trunk of her car and heard Ms. Watts say: “You better get out of here.” Ms. Davis said there did not appear to be *1149 any trouble. Ms. Watts was standing in the front doorway speaking with a man wearing a red shirt and blue pants with deep set eyes and his hair styled in jerri-curls. Ms. Davis went back into her house and almost immediately heard a gunshot. She walked to her front door and saw a woman lying on Ms. Watts’ porch. Ms. Davis witnessed the man she had seen speaking with Ms. Watts shoot the woman on the porch two times, rummage through her handbag and then shoot her a third time. Ms. Davis called 911, and all the while, she continued to watch the shooter as he walked from the porch and exited the neighborhood via Annette Street. Ms. Davis stated that she had a good opportunity to view the shooter’s face as he stood on the porch speaking with Ms. Watts.
According to Ms. Davis, as soon as the shooter walked from the area, other neighbors gathered to see what had happened. Ms. Davis spoke with Mr. Dominick who told her that the woman who had been shot was Ms. Gex, not Ms. Watts. At that point, there was smoke pouring from Ms. Watts’ house. The neighbors feared Ms. Watts was inside the house, so someone went into the house and removed Ms. Watts’ body. Ms. Davis identified a picture of Ms. Watts’ body lying in the grass.
IsMs. Davis recalled that the shooter walked away calmly and slowly after the shooting, as if nothing had happened. As the shooter walked, he turned several times to see if anyone was behind him, thus providing her with an opportunity to get a good look at him. Although the first responders arrived quickly, Ms. Davis was so traumatized by the shooting that she was hesitant to speak with the police. On September 2, 2004, however, she gave a taped statement to the police positively identifying the defendant as the shooter from a six-person photo lineup. She also testified before the grand jury. Ms. Davis identified the defendant in court as the man that shot Ms. Gex.
On cross-examination, Ms. Gex stated that she had not seen the defendant in the neighborhood prior to the shooting.
Captain Herman Franklin of the New Orleans Fire Department testified that he responded to the fire at 1930 Duels Street on June 15, 2004, after his unit was notified by the first responders from Fire Engine 27, who had responded to a call for medical assistance. Upon arriving on the scene, Captain Franklin and another fireman made a preliminary search of the residence for anyone in the house. The smoke in the house was extremely thick but they located Ms. Watts on the kitchen floor next to the stove and removed her to the EMS unit waiting on the scene. Captain Franklin, after identifying photos of Ms. Watts’ house that showed the fire and the crime scene, stated that the fire was investigated as arson.
Ms. Anna Duggar, director of the NOPD Crime Lab, testified that in June 2004 she was a criminalist assigned to the forensic light unit and that her specializations were blood spatter pattern analysis, latent fingerprint analysis and comparison, serology, DNA preparation and analysis of hair and fiber evidence. Ms. Duggar processed the crime scene at 1980 Duels Street on June 18, 2004, and |flshe noted her findings in a report. She also identified photographs she took of the crime scene. Ms. Duggar noted that two knives, one with a serrated edge and the other with a rounded blade, were retrieved from the kitchen sink at 1930 Duels Street. Although she tested the knives for fingerprints and the presence of blood, they were negative for blood and latent prints. Ms. Duggar explained that, although she collected blood samples from the kitchen, no fingerprint testing was performed at the crime scene because the fire and suppression efforts rendered testing impossible.
*1150 Detective Winston Harbin of the NOPD testified that he was the lead investigator of the murders of Ms. Watts and Ms. Gex. He and Detective Claude Nixon met with Mr. Dominick on June 16, 2004, and he assisted in the compilation of a sketch of the perpetrator that was released to the news media. After the sketch was released, thirty to thirty-two Crimestopper tips were reported to police but were systematically eliminated as possible leads.
On June 17, 2004, Detectives Harbin and Nixon viewed the crime scene, noting the presence of blood droplets on the kitchen cabinets and refrigerator. Accordingly, Detective Harbin directed Ms. Duggar to collect blood evidence from the kitchen. That same day, Ms. Garcia’s husband gave Detective Harbin the sketch he had drawn from his wife’s description of the shooter. While in the neighborhood on June 17, 2004, Detective Harbin received information from a resident[3] that directed him to an address in the 2100 block of Law Street, the residence of Ladrika Davis.[4] Detective Harbin’s investigation developed a | ^description of the defendant as a light skinned black male, standing 5'9", weighing 180 pounds, and wearing a red shirt with blue pants, tan fishing hat and sunglasses. After learning that the defendant had been arrested on two previous domestic violence charges involving Ms. Ladrika Davis, Detective Harbin obtained a copy of the defendant’s booking photo and placed it in the six-person photo lineups that he presented to Mr. Dominick. Mr. Dominick told Detective Harbin that one suspect’s picture “jumped out at him,” and another “looked like the guy who hung out with Ms. Dot’s grandson,” but he was unable to identify the perpetrator from the lineup. Detective Harbin also showed the lineup to Ms. Cecilia Garcia and Ms. Linda Davis, who both identified the defendant as the man they had seen at Ms. Watts’ house at the time of the shooting. Detective Harbin also discovered that the defendant had been arrested on municipal charges approximately eight hours after the murders of Ms. Watts and Ms. Gex.
From further investigation, Defendant Harbin obtained a search warrant for the defendant’s mother’s residence on Erato Street. During the search, several items of clothing and several pairs of shoes, including a pair of tennis shoes that appeared to have blood on them, were seized and submitted for forensic testing. Detective Harbin learned that the defendant went by the nickname “Short Story.”
On July 7, 2004, the defendant waived his rights and gave Detective Harbin a videotaped statement denying involvement in the murders. The defendant offered the alibi of having filed job applications with several restaurants/hotels and fast food businesses in the CBD.[5]
|n During cross-examination, Detective Harbin admitted that no forensic evidence collected or tested linked the defendant to the murders.
Dr. Paul McGarry, formerly a forensic pathologist with the Orleans Parish Coroner’s Office, testified that he performed the victim’s autopsies on June 16, 2004. *1151 Dr. McGarry noted that Ms. Gex suffered four gunshot wounds — one each to the head, the chest, the left upper back, and the left arm. The trajectory of the first two wounds indicated that the victim was standing when the shots were fired, while the third and fourth wounds were sustained as the victim was turning away from and/or falling as a result of the first two shots. Ms. Gex died of internal hemorrhaging and massive brain damage. Ms. Watts’ autopsy revealed that she died from fourteen stab wounds to her face, forehead, neck, and central chest. The wounds to her chest went through her breast bone, ribs, heart and both lungs, causing massive internal hemorrhaging within the heart chamber and major blood vessels to the heart. Dr. McGarry determined that Ms. Watts’ body sustained extensive burning. Soot deposits around the victim’s nostrils indicated that the victim was alive when she was set on fire. The pathologist opined that the victim was stabbed with a knife having a three to four inch blade, similar to a boning knife.
Captain Rose Duryea testified that in June 2004 she was the commander of the NOPD Crime Lab. Her job involved overseeing all testing performed and authenticating reports generated by lab employees. The captain verified that testing of fingernail scrapings from the victim and search for fingerprints from the crime scene were negative.
The defense called Mr. James McCullough of the Louisiana Department of Public Safety, Office of Motor Vehicles. In his capacity as custodian of records, |iaMr. McCullough produced the DMVs records pertaining to a Mr. Terrence Roche, which referenced the license plate number MKF 690.[6]
Ms. Monique Louque, the Human Resource director for the Monteleone Hotel, also testified for the defense. In the course of her employment, Ms. Louque accepted job applications on behalf of the hotel on Tuesdays from 9:00 a.m. to 11:00 a.m. and then again from 2:00 p.m. to 4:00 p.m. on those days. She produced a list of job applicants dated June 15, 2004, indicating that the defendant applied for the for the position of room attendant/dishwasher on that date. Copies of those exhibits were published to the jury. Ms. Louque testified, however, that she had no particular memory of the person who signed the application as “Darrill Henry” and noted that the application did not indicate the time of day the defendant signed the application.
On cross examination, Ms. Louque explained that when someone signs an employment application, they are not asked to produce identification. Only after an applicant advances to the interview stage in the hiring process does the hotel require proof of identification. Ms. Louque said that according to her records, the defendant did not proceed past the application stage to the interview portion.
In addition, two other Hotel Monteleone employment recruiters, Ms. Kerri Colombo and Mr. Prescott Kerutis, testified that they had no memory of anyone who filled out employment applications on June 15, 2004.
Private Investigator, Frank Mistretta, explained that he was engaged by the defense to obtain measurements from the scene of the crime[7] to the three houses, *1152 [ 131933, 1935 and 1937 Duels Street, the vantage points from which the three eyewitnesses observed the shooting. He identified Defense Exhibit 59 as the diagram of his measurements and Defense Exhibit 60 as an aerial photograph of the 1900 block of Duels Street. During cross-examination, Mr. Mistretta explained that the purpose of the diagram was to allow the jury to determine whether the eyewitnesses could see what they claimed to see from their respective vantage points.
Mr. Raynold Antonio testified on behalf of the defendant, stating that on the day of the murder he lived at 1916 Duels Street and heard Ms. Watts’ tell someone that she did not have anything. However, he could not see the person to whom Ms. Watts was speaking. Shortly thereafter, at about 1:40 p.m., Mr. Antonio was sitting on his mother’s porch at 1929 Duels Street and heard a popping noise, similar to the sound of glass cracking or a firecracker, then heard a female voice say: “Why are you doing this?” He heard another pop and he realized it was a gunshot. Mr. Antonio walked to the front gate and observed a man wearing a red shirt, blue jeans and a brown hat walking away from Ms. Watts’ house down Annette Street toward Florida Avenue. Mr. Antonio did not see the man’s face. He heard Ms. Garcia screaming for help and walked over to Ms. Watts’ porch where he observed a woman lying on the porch. Mr. Dominick came over and the two of them carried the woman (Ms. Gex) from the porch. Mr. Antonio noted that the Watts’ residence was on fire.
Ms. Anne Montgomery was also called by the defense and testified by stipulation as an expert in DNA analysis. At the time of the murders of Ms. Watts |14and Ms. Gex, Ms. Montgomery was the DNA technical leader of the NOPD Crime Lab. After an explanatory discussion of the history of DNA testing and procedures and local and national storage bases for DNA information for use in crime fighting, Ms. Montgomery identified reports from the NOPD’s Scientific Criminal Investigation Division of DNA testing done in this ease by Ms. Montgomery and her staff. The reports indicate that a total of eleven blood samples were submitted for testing and those samples produced DNA profiles belonging to one or the other of the victims. A blood sample taken from a tennis shoe seized from the defendant’s mother’s residence on Erato Street produced the DNA profile of the defendant.[8] In short, Ms. Montgomery stated that the DNA in this case proved to be nothing of evidentiary value — nothing implicated or exculpated anyone in the murders.
Next, on behalf of the defense, Mr. Ruben Watts, the grandson of Ms. Watts and the nephew of Ms. Gex, testified that the night before the murders, he offered to cut Ms. Watts’ grass. She refused his offer, stating that she had someone else to do it but without identifying the person.
Ms. Jainey Young, who was employed by First Evangelist Housing Community Development Corporation, explained that her job involved finding employment for people who sought the corporation’s assistance. Toward that objective, the corporation maintained daily and weekly sign-in sheets of the names of people who appeared at the corporate office seeking food and/or employment assistance. Ms. Young identified the daily and weekly sign-in 11i;sheets kept by the corporation for the period of June 14 to June 18, 2004. The *1153 weekly sign-in reflected that the defendant sought employment assistance during that period but the daily sheet for June 15, 2004, did not reflect that the defendant signed up for job assistance on that date.
At this point in the trial, the judge read Detective Eduardo Colmenaro’s cross-examination testimony given during the hearing on the motion to suppress the identification on February 19, 2009.[9] The detective explained that he assisted Detective Harbin in the murder investigations. He accompanied Detective Harbin when Harbin displayed a six-person photo lineup to Ms. Garcia at her home.
The defense called Mr. Dominick. He denied receiving an immunity agreement from pexjury charges from the State. Mr. Dominick recalled that approximately one to two months prior to trial, he and his attorney attended a meeting arranged by prosecutors. His parents, Ms. Cecilia Garcia, and Ms. Linda Davis and her husband were also present at the meeting. Mr. Dominick had a subsequent meeting with the prosecutors, also attended by Ms. Garcia and Ms. Davis. Mr. Dominick denied being offered consideration for his trial testimony or believing he would obtain any benefit. He identified his voice on the CD containing telephone calls he made to his family from jail requesting information about the proceedings and the possibility of “leverage” because of his testimony.
In rebuttal, the State called John Butler, the attorney representing Mr. Dominick in criminal matters pending against him at the time of this trial. Mr. Butler testified that he asked the prosecutors on several occasions if Mr. Dominick would receive any consideration in his criminal case from the State in exchange for his testimony in this case, but that the prosecutors refused and, against his advice, Mr. Dominick testified at this trial.
| ifiMr. Butler confirmed that he was present at a July 28, 2011, meeting with prosecutors in this case with Mr. Dominick and his parents. After Mr. Dominick was escorted from the meeting, the District Attorney arrived and thanked everyone for attending the meeting. After that meeting, Mr. Butler spoke with Mr. Dominick’s parents about his pending criminal charges, specifically plea bargaining as to non-violent rather than violent offenses. Mr. Butler emphasized that all overtures he made to the prosecutors as to consideration for Mr. Dominick’s testimony in this case were flatly refused.
The evidence in this case is constitutionally sufficient to support the defendant’s conviction. In summary, there is no dispute that the victims were over the age of sixty-five and that the house was set on fire by the perpetrator. Moreover, two eyewitnesses (Ms. Garcia and Ms. Davis) identified the defendant in photographic lineups after the incident and three eyewitnesses (Ms. Garcia, Ms. Davis and Mr. Dominick) identified the defendant in court as the man they witnessed shoot Ms. Gex on the porch of her mother’s house. Thus, for the defendant to have been misidentified, the jury would have to have concluded that all three eyewitnesses were mistaken as to the same individual. In addition, although the defendant offered witness testimony and documentation of work applications, none of the testimony or the documentation was specifically linked to the time of the murders. Therefore, the jury could have reasonably concluded that the defendant killed the victims before or after filling out the applications.
This assignment of error is without merit.

*1154
Assignment of Error No. 2

|17In his second assignment of error, the defendant contends that the photographic line-ups conducted by Detective Harbin were unconstitutionally suggestive and, therefore, the trial court erred in denying his motion to suppress the identifications made by Ms. Garcia and Ms. Davis. He also argues that the trial court erred in refusing to allow the defense to call an expert witness on identification procedures.

Applicable Law

The Fifth and Fourteenth Amendments to the United States Constitution protect defendants from unreliable evidence in criminal proceedings through the provision of rights and resources that function to persuade juries that such evidence is untrustworthy. The defendant bears the burden of proof in his motion to suppress an out-of-court identification. La.Code Crim. Proc. art. 703; State v. Thibodeaux, 98-1678, p. 20 (La.9/8/99), 750 So.2d 916, 932. To prevail on such a motion, a defendant must show that the identification procedure in question was suggestive, Manson v. Brathwaite, 432 U.S. 98, 106, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), and that the procedure created a substantial likelihood of misidentification such that defendant was denied due process of law. Neil v. Biggers, 409 U.S. 188, 196, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); State v. Prudholm, 446 So.2d 729, 738 (La.1984). To prove suggestiveness, a defendant must show that the police conduct in organizing and administering the identification was improper. Perry v. New Hampshire, — U.S.—, 132 S.Ct. 716, 724, 181 L.Ed.2d 694 (2012). An identification is suggestive if the witness’ attention is “unduly focused” on the defendant. State v. Brown, 09-0884, p. 5 (La.App. 4 Cir. 3/31/10), 36 So.3d 974, 979.
We review a trial court’s determination on the admissibility of an out-of-court identification and its subsequent denial of a motion to suppress for abuse of | ^discretion. Brown, 09-0884 at p. 3, 36 So.3d at 978. This review is not limited in scope to the evidence introduced at the hearing on the motion to suppress; rather, consideration extends to all pertinent evidence adduced at trial. State v. Chopin, 372 So.2d 1222,1224 n. 2 (La.1979).
In this case, four separate hearings were held (on February, 11, 2005; September 25, 2008; January 22, 2009; and February 19, 2009) in relation to the defendant’s motion to suppress these identifications:

First Hearing:

Detective Harbin testified that Ms. Garcia informed him that on the day of the murders, she heard “popping” noises and exited her house to investigate. She noticed a man, who was wearing a red shirt, blue pants, sunglasses and a hat, standing in front of Ms. Watts’ residence. Two days after the shootings, Ms. Garcia’s husband gave Detective Harbin a sketch of the perpetrator as drawn to Ms. Garcia’s specifications. Ms. Garcia was reluctant to speak with him but on July 7, 2004, when the detective, showed Ms. Garcia a six-person photo lineup that included the defendant’s picture, she identified his photo and wrote on the back This is the man I saw walking away from Mrs. Watts’ porch on 6-15-04.
Detective Harbin learned from Ms. Linda Davis that as she exited her car in her driveway, she heard loud taking between Ms. Watts and a man in a red shirt standing on Ms. Watts’ porch. Ms. Davis entered her house, but returned to her vehicle about ten minutes later. While standing at her car, she heard gunshots. She observed the suspect standing on the Watts’ porch firing a weapon at Ms. Gex, who had fallen onto the porch. On September 2, 2004, Ms. Davis identified the defendant’s photo from the same lineup *1155 viewed by Ms. Garcia. Detective Harbin testified that he inserted a different, unsigned copy of the defendant’s photo into |19the lineup and rearranged the filler photos prior to Ms. Davis’ viewing. Detective Harbin asserted that Ms. Davis was not shown any other photographs pri- or to viewing the September 2, 2004, lineup.
Detective Harbin testified that he presented a photo lineup to Mr. Dominick who indicated that one of the people depicted in the lineup “jumped out at [him].” He then focused on the defendant’s picture and said: “This guy looks familiar. I know him from the neighborhood.” However, Mr. Dominick did not make a positive identification from the lineup. Detective Harbin related that Mr. Dominick told him that he normally wore glasses, but was not wearing them at the. time of the murders. In addition, Mr. Dominick worked with a police artist to compile a sketch of the suspect.
Detective Harbin explained that he was led to the defendant as a possible suspect by Ms. Gex’s family members who learned from a neighbor (who did not want to get involved) that he (the neighbor) had followed the suspect to a house on Law Street. Detective Harbin ran the address through the motion system and obtained the name of Ladrika Davis, the defendant’s ex-girlfriend. Further investigation revealed that Ladrika Davis brought charges against the defendant for domestic abuse. Detective Harbin obtained the defendant’s booking photograph and placed it in the lineups he presented to Ms. Garcia, Ms. Davis, and Steven Dominick.
Ms. Garcia testified that she lived across the street from the Watts’ residence and had known Ms. Watts for years. Ms. Garcia was in her house when she heard gunshots. She walked outside to investigate, and she observed the suspect standing on Ms. Watts’ front porch next to a woman’s body. Ms. Garcia walked toward the Watts’ house, passing within twenty to twenty-five feet of the suspect as he walked |gnaway. As she approached the house, she realized that Ms. Gex, not Ms. Watts, was lying on the porch. Shortly after the shooting, she saw a sketch of the suspect on the news. She did not think it looked like the perpetrator, so she had her husband draw a composite from her memory and gave it to the police. From the photo lineup presented by Detective Harbin, Ms. Garcia identified the defendant as the man she saw walking from the Watts residence on the day of the murders.
Ms. Garcia recalled that the suspect wore a hat pulled very low on his head, causing a shadow to cover his eyes, which looked as though he may have been wearing sunglasses. The hat covered the suspect’s braids, and she did not notice any facial hair. She said the person she saw “looked like somebody that might be familiar but [she] didn’t know him personally.” She also said that as she viewed the lineup, she covered the faces from the eyes up.
Ms. Davis testified that she was looking for her telephone book in her car when she heard Ms. Watts tell a man standing on her porch that he better leave. Ms. Davis found the telephone book and went into her house. Moments later, she hear heard a gunshot. She went to the door in time to see the suspect standing over a woman’s prone body firing two more shots. Initially, she mistakenly thought that the suspect had shot Ms. Watts, but he actually shot Ms. Gex. The suspect was wearing a red shirt and blue jeans. As the suspect walked away, he repeatedly turned around to look at the victim’s body on the porch, thereby providing Ms. Davis with ample opportunity to see his face. She looked at him directly in the face, noticing that he had deep set eyes. On September 2, 2004, *1156 she identified the defendant from a photo lineup as the man that shot Ms. Gex.

Second Hearing

|21The defense recalled Detective Harbin, who recalled that on June 23, 2004, he compiled two photo lineups which he showed to Ms. Garcia and Ms. Davis. In both of those lineups, the defendant is wearing a red T-shirt. However, the ran-domizations of the filler photos were different in each lineup. Harbin explained that in compiling a lineup, he sought individuals with physical traits similar to a suspect. When questioned about the criteria he used to show Ms. Davis and Ms. Garcia a lineup in which only the defendant was wearing a red T-shirt, Harbin responded:
There was no criteria. There was no specific intent on my part, which is what I’m gathering from your question, that I specifically put him in the lineup — and him being the only one in the red shirt— in the hopes that he would be identified. I don’t work like that.
I put this lineup together. If anything, I didn’t show the same lineup to anyone. I manipulate the photographs so the person is not in the same position so if in the event the witnesses talk amongst themselves for any reason, one won’t tell the other, I picked him out of number three.
As far as the color of the shirt, those were the only booking photographs that I had at my disposal at the time. There was no — I mean, I guess if he had horizontal shirts we’d be here arguing horizontal in lieu of [sic] vertical stripes shirts, multi colors.
I don’t know what else to say to you, but I don’t operate like that. I put the lineups together with what I had, the best I had. The witnesses either saw the perpetrator or they didn’t see the perpetrator. I present them with the lineup; they either say yes or they say he’s not in there. And that’s the extent of what I do when I show lineups.
[[Image here]]
The fact that he’s wearing a red shirt and [sic] his previous two booking photographs does nothing more for me other than explain he wears red shirts. The fact that he is in the lineup in a red shirt was all I had to work with at the time. I did not, and I know — this is what I’m getting from you — I did not specifically put him in the lineup wearing a red shirt.
I searched for any other photographs I could with a red shirt. Put him in the lineup with horizontal stripes, blue shirt, green shirt, a multitude of different col- or shirt with different individuals.
The defense counsel showed Detective Harbin a booking photo of the defendant taken on May 15, 2004, stemming from the municipal charges for which |2athe defendant was arrested on the day of the murders. In that photo, the defendant is wearing a white shirt. Detective Harbin informed counsel that the photograph from the municipal charges was not contained within the State’s identification system used to compile the lineup and, therefore, not available for his use in the photo lineups he compiled for the witnesses.
Detective Harbin testified that when he interviewed Ms. Davis prior to her grand jury testimony on September 2, 2004, she indicated that she saw a sketch or picture of the defendant on the news but neither looked like the perpetrator. Detective Harbin had no knowledge of Ms. Davis’ viewing any photographs prior to viewing the lineup, but he acknowledged she had some interaction with the district attorney’s investigator.
Detective Harbin recalled that Ms. Garcia viewed the photographic lineup at her home but did not remember that she cov *1157 ered portions of the photographs as she examined the lineup. He further recalled that he did not present a photographic lineup to Ms. Garcia prior to July 7, 2004, either because the lineup was not available or because he preferred to wait until he determined what she would say prior to allowing her to view a lineup.

Third Hearing

The defense called Aaron Walker, its private investigator, who explained that he was retained to measure distances from the residence of Ms. Watts to the street, as well as to vantage points from which the eyewitnesses allegedly observed the defendant on the day of the murders. Mr. Walker testified that his calculations and measurements revealed that the distance from the residence of Ms. Watts to the residences at 1933, 1935, and 1937 Duels Street was 97.4', 75' and 70', respectively.
| i>c¡Ms. Davis recalled meeting with a black detective at the District Attorney’s Office and viewing a photographic lineup. She identified the defendant from the lineup and signed the back of the defendant’s picture to denote her identification. The color of the shirt and the deep circles around the defendant’s eyes led to her identification of the defendant’s picture. She said: “I remember the dark circles underneath his eyes. I looked right in his face.... ” She gave a statement to a white detective on September 2, 2004. Ms. Davis acknowledged that the defense counsel sent her a copy of her statement. When she saw a sketch of the perpetrator on television, she told her husband that the sketch did not look like the perpetrator. Ms. Davis was emphatic that she did not just consider the red shirt when she identified the defendant. She looked at his face. No one told her whom to pick out of the lineup and no one told her she had picked the correct person or that the police had a suspect in custody at the time she viewed the lineup.

Fourth Hearing

Detective Colmenaro testified that he accompanied Detective Harbin to present a photo lineup to Ms. Garcia at her residence on July 7, 2004. Ms. Garcia immediately picked the defendant’s picture from the lineup. She wrote on the back of the photo: “This man is the man I saw walking away from Ms. Watts’ porch on 6-15-04.”
Ms. Garcia testified that Detective Harbin and another detective presented her with a photo lineup at her home on July 7, 2004, from which she identified the defendant in less than one minute. She signed the picture: “This is the man I saw walking away from Ms. [Watts’] porch.” She had not been shown any photographs of suspects prior to the lineup. The police did not tell her that they | ?4had a suspect in custody at the time of the lineup or that a suspect had been identified.

Analysis

Detective Harbin conceded that the two photographs of the defendant he used to compile the lineups presented to Ms. Garcia and Ms. Davis depicted the defendant wearing a red shirt — the same color shirt the witnesses said the shooter wore the day of the murders. Although this is problematic, the detective explanation that those pictures were the only ones at his disposal at the time he compiled the lineup appears undisputed. The detective denied any attempt to single out the defendant or to unduly focus the witnesses’ attention on the defendant and the defendant has offered no proof to discredit Detective Harbin’s testimony.
Moreover, Ms. Garcia and Ms. Davis both testified that they had ample opportunity to view the perpetrator on the day of the shooting. Both Ms. Garcia and Ms. Davis said they could see the defendant’s face in the broad daylight and, in fact, Ms. Garcia’s view of the defendant’s face was so clear that her husband sketched the *1158 shooter according to her directions. Both women described the shooter as a black male wearing a red shirt and blue pants. When confronted several weeks after the murder with the photographic lineup compiled by Detective Harbin, both witnesses positively and immediately identified the defendant and neither ever wavered from her identification of the defendant. Morer over, Ms. Garcia and Ms. Davis also positively identified the defendant at trial.
The defendant argues that Ms. Davis’ identification is tainted because she saw his picture on the news prior to identifying him in the photo lineup. The jurisprudence does not support this argument. See State v. Gilmore, 2011-1606, |gs(La.App. 4 Cir. 2/8/13), — So.3d —, 2013 WL 476008, (eyewitness viewing pictures of the defendant on the internet prior to viewing a photographic lineup assembled by the police did not render the procedure used by police unconstitutionally suggestive or taint the eyewitness’ identification of the defendant prior to and during trial, especially where the jury was aware that the eyewitness had seen defendant’s photograph prior to identifying him in a lineup and the eyewitness identified only the defendant in the police lineup); see also State v. Daughtery, 563 So.2d 1171, 1174 (La.App. 1st Cir.1990) (the viewing of television news coverage of a defendant’s arrest or seeing his picture in a newspaper is not an element of an identification procedure). Accordingly, the defendant has failed to carry his burden of proving the photo lineup in this case was suggestive and there is no merit in this argument.
Notably, the defendant also argues that the trial court erred in refusing to allow expert testimony concerning the causes of misidentifieation. Under current jurisprudence, however, this argument is problematic. See State v. Young, 2009-1177, pp. 13-14 (La.4/5/10), 35 So.3d 1042, 1049-1050 (expert testimony on eyewitness identifications can be more prejudicial than probative because it focuses on the things that produce error without reference to those factors that improve the accuracy of identifications; expert testimony presumes a misidentifieation, in the absence of presenting factors which support the validity of the identification). Although the defendant maintains in his appellate brief that the purpose of the expert testimony was not to “refute the eyewitness’s credibility” at trial, but “to address the defense’s burden in regard to the photographic lineup procedure, i.e. to show that the procedure was suggestive, and also that the procedure created a substantial likelihood of misidentifieation,” in his motion in 12(\Hmine before the trial court the defendant asserted that “the issue for the expert is to educate the jury about how Ms. Garcia’s memory was affected by the suggested lineup.” Thus, the defense’s stated purpose for' the expert testimony would violate the prohibition against “invad[ing] the field of ... [the] education of men.” State v. Stucke, 419 So.2d 939, 945 (La.1982). Therefore, in accordance with the current controlling jurisprudence of the Louisiana Supreme Court, we do not find that the trial court abused its discretion in refusing to allow the defense expert to testify.

Assignment of Error No. 3

By a third assignment of error, the defendant charges three instances of prose-cutorial misconduct.
First, the defendant alleges his Brady rights were violated by the State’s failure to disclose exculpatory evidence of the plea deal the State made with Mr. Dominick in exchange for his trial testimony. Under Brady, the prosecution has a duty to disclose evidence favorable to a defendant, whether the evidence is exculpatory or impeachment, prior to trial. In *1159 this case, Mr. Dominick testified at trial that he was not offered nor did he believe he would be offered a deal in exchange for his testimony. The defense presented a scathing cross-examination of Mr. Dominick reviewing details of his pending prosecutions, his understanding of the State’s authority to reduce or dismiss charges and every interaction Mr. Dominick had with prosecutors since the inception of his criminal prosecutions.
The prosecutor informed the court that the District Attorney’s Office never offered Mr. Dominick any deals. Even Mr. Butler, the attorney representing Mr. Dominick in the criminal matters pending against him at the time of this trial, testified that he asked the prosecutors on several occasions if Mr. Dominick would receive any consideration in his criminal prosecution in exchange for his testimony | 27in this case. Mr. Butler maintained that the prosecutors flatly refused his requests on every occasion and that Mr. Dominick testified at this trial against his advice.
Next, the defendant claims the prosecution violated Brady by unlawfully withholding phone calls made by Mr. Dominick to family members. The defendant argues that the calls contained impeachment information. The record indicates, however, that the State was never in possession of the recordings of the phone calls. Following the first day of trial, defense counsel requested that the Criminal Sheriffs Office be subpoenaed to produce the defendant’s telephone and medical records. The following day, the Sheriff produced the items requested and the court released the phone recordings to the defense.
Thus, even if the State could be held accountable for failing to provide the information, the calls were available to, and obtained by, the defense. Mr. Dominick was subjected to lengthy and withering cross-examination on the calls. The defense thoroughly explored any possible impeachment value. The defendant’s argument is without merit.
Next, the defendant complains the State failed to produce the grand jury transcript of the State’s three key witnesses. The record shows that the first judge handling this matter reviewed a portion of the grand jury testimony and provided the defense with those portions of Detective Harbin’s testimony that the court determined was inconsistent with the detective’s testimony at the motion hearing. The issue remained contentious with the defense pushing for disclosure of the grand jury testimony of the three eyewitnesses in order to highlight alleged | ^inconsistencies between their statements, grand jury testimony and trial testimony.[10]
During trial, the defense obtained a copy of the grand jury transcript.[11] The de *1160 fense counsel argued that the transcript contained impeachment evidence vital to-the case. The trial judge informed the defense that it would be allowed to recall any of the State’s witnesses it chose for impeachment purposes with the portions of the grand jury transcript previously ordered disclosed by the prior judge. Later in the defendant’s case, the trial judge ordered the State to provide the defense with the entire grand jury transcript, which the State did. Of the three eyewitnesses to the crimes, the defense chose to call only Mr. Dominick. The defense highlighted some differences between Mr. Dominick’s grand jury testimony, previous statements and trial testimony concerning the perpetrator’s identity. However, Mr. Dominick was able to explain his responses, blunting the defendant’s argument that the responses were effective impeachment information which the prosecution had a duty to relay to the defense. Moreover, the defendant has not identified any impeachment information contained in the grand jury transcript that was | ^unlawfully withheld from the defense prior to the trial judge’s mid-trial order turning the transcript over to the defense. This issue is meritless.
Finally, the defendant argues that during closing argument, the prosecutor improperly and prejudicially argued that the “Ms. Dot” notation on the defendant’s Rally’s job application[12] was a reference to Ms. Watts. The defendant maintains that the State manufactured this connection between the defendant and victim because it had no evidence to link him to the victim or the crimes.
Pursuant to La.Code Crim. Proc. art. 774, the scope of closing argument should be confined to the evidence admitted, the lack of evidence, conclusions of fact that the State or defendant may draw therefrom, and the law applicable to the case. The State’s rebuttal shall be confined to answering the argument of the defendant. Id. While prosecutors have wide latitude with regard to tactics used during closing arguments, they should not appeal to prejudice and should refrain from making personal attacks on defense strategy and counsel. State v. Manning, 2003-1982, p. 75 (La.10/19/04), 885 So.2d 1044, 1108. Nevertheless, even where a prosecutor exceeds that wide latitude, the reviewing court will not reverse a conviction unless thoroughly convinced that the argument influenced the jury and contributed to the guilty verdict. State v. Taylor, 93-2201, p. 19 (La.2/28/96), 669 So.2d 364, 375.
A trial court has broad discretion in controlling the scope of closing arguments, and Louisiana courts have consistently held that great consideration should be accorded to the good sense and fair-mindedness of jurors who have seen the evidence, heard the arguments, and repeatedly been instructed by the trial judge Isnthat arguments of counsel are not evidence. State v. Casey, 99-0023, p. 17 (La.1/26/00) 775 So.2d 1022,1036.
At trial, Detective Harbin testified that Mr. Dominick pointed to the defendant’s photograph and said: “This guy looks familiar; I know him from the neighborhood; I think he hangs out with Ms. Dot’s grandson.” During closing argument, the *1161 prosecution reviewed Detective Harbin’s trial testimony:
PROSECUTOR:
Detective Harbin testified that when he showed Steven Dominick the line-up that Steven Dominick said this guy look [sic] familiar, from the neighborhood. I am thinking this is the guy that looks familiar. He hangs out with Ms. Dot’s grandson.
DEFENSE:
Objection, your Honor, facts not in evidence.
COURT:
I overrule that. That is for the jury to decide. I am not saying the lady is correct or not. Let the jury decide that, sir. I note your objection, sir.
STATE:
Rely on each other’s memories. Ask each other what you remember from Detective Harbin. I think that’s the guy. It looks like Ms. Dot’s grandson— the guy who hangs out with Ms. Dot’s—
DEFENSE:
Objection, your Honor, facts not in evidence.
COURT:
I overrule that. I am not saying the lady is correct or not. Let the jury make that decision. I note the objection for the defense.
Thus, the defendant is incorrect in his assessment that the prosecution argued that “Ms. Dot” was Ms. Watts. The prosecution merely commented on evidence admitted at trial.
This assignment of error is without merit.

\ ^Conclusion

After review of the record in light of the applicable law and arguments of the parties, the defendant’s conviction is affirmed.
AFFIRMED.
TOBIAS, J., concurs.
LANDRIEU, J., concurs for the reasons assigned by Judge Tobias.

. Mr. Dominick pleaded guilty to the 139 counts. On appeal from the trial court’s denial of his motion to withdraw his guilty plea, the court upheld the trial court ruling. See State v. Dominick, 2013-0270 (La.App. 4 Cir. 1/30/14), 133 So.3d 250.

. Those convictions were affirmed by this court. See State v. Dominick, 2013-0121 (La.App. 4 Cir. 11/20/13), 129 So.3d 782.

. The person who gave Detective Harbin the information did not want to be involved in the case but told Detective Harbin that a person from the neighborhood followed the defendant from the scene of the crime to a residence on Law Street.

. Ms. Ladrika Davis was the defendant’s ex-girlfriend. The defendant lived with Ms. Davis at that address, which was two blocks from the crime scene, until shortly before the murders.

.Detective Harbin verified that the defendant had filed job applications with the businesses he claimed, but none of the applications could be verified as to the time of the day on June 15, 2004, that they were filed.

. The reference to Mr. Roche and the license plate number MKF 690 came to Detective Harbin’s attention during the investigation. It was supplied by a Crimestopper’s tip, but the information did not prove to be of any evidentiary value to the murder investigations.

. Mr. Mistretta noted that the Watts’ residence was destroyed by Hurricane Katrina, so he established a point on the sidewalk where *1152 the house used to be and used that as the reference point to measure the distance from the Watts’ residence to the three houses across the street.

. The testing division had earlier obtained a sample of the defendant’s blood which it compared with the blood from the tennis shoe to identify the donor.

. Detective Colmenaro did not testify at trial.

. During trial, the trial judge ordered the State to turn over to the defense the entire grand jury testimony relating to the defendant. On application for supervisory review filed by the State, this court granted writ, reversed the trial court ruling, and ordered "that the entirety of the grand jury proceedings transcript, save the testimony of Detective Harbin, be returned to the court and that the defendant be prohibited from referring to any other grand jury testimony whatsoever at trial." See State v. Henry, unpub., 11-1187 (La.App. 4 Cir. 8/29/11), writ denied, 11-1887 (La.8/30/11), 68 So.3d517.

.- Defense counsel explained:
Your Honor, yesterday we are at counsel table. Counsel for the prosecution was laying out its evidence. They were moving documents, asked me, get your stuff off the table so we can lay out our stuff. I began piling. Do you see how neat I am out there?
[[Image here]]
I began grabbing stuff. I went to dinner. At 9:30, 10:00 I opened my brief case and found the grand jury transcript in my brief case.
*1160 Inside this transcript is impeachment material to their entire case, particularly supporting our central theory. I got to page — I got to page — I didn't read everything. I was flipping through [Detective] Harbin[s testimony]. I get to page 39. I read — or 36. I read what Detective Harbin has to say. I called co-counsel. I have not even read the whole thing.

. The defendant listed “Ms. Dot" as a reference.