BLEICH (Ad Hoc), J.,
on rehearing,
hThe State of Louisiana filed an application for rehearing after Footnote 6 and a section entitled “Summary” were added to the court’s opinion after it was originally rendered. This court grants rehearing for the limited purpose of withdrawing the opinion containing these additions. We reissue the opinion originally rendered as follows:
The executrix of the estate of Glenn Ford, the deceased petitioner (hereinafter “Ford” or “petitioner”), appeals the denial of Ford’s petition for wrongful conviction compensation under La. R.S. 15:572.8.[1] For the reasons set forth, we affirm.
*1245 FACTS AND PROCEDURAL BACKGROUND
In 1984, Ford was convicted of first degree murder and sentenced to death for the November 5, 1983, armed robbery and murder of Isadore Rozeman. His conviction and sentence were affirmed on appeal. State v. Ford, 489 So.2d 1250 (La.1986). In late 2013, the Caddo Parish District Attorney’s Office stated that it had obtained credible evidence that Ford “was neither present at, nor a participant in, the robbery and murder of Isadore Rozeman,” and filed a motion to vacate Ford’s conviction and sentence. On March 10, 2014, the trial court granted the state’s motion. Ford was released the following day after spending nearly 30 years on death row. On June 10, 2014, all charges against Ford were dropped. The record ^reflects that, at the time of the filing of the instant petition, two other individuals, Jake Robinson and Henry Robinson, were being prosecuted for the robbery and murder of Mr. Rozeman.
On December 2, 2014, Ford filed a petition for compensation for wrongful conviction and imprisonment pursuant to La. R.S. 15:572.8, which provides as . follows:
A.A petitioner is entitled to compensation in accordance with this Section if he has served in whole or in part a sentence of imprisonment under the laws of this state for a crime for which he was convicted and:
(1) The conviction of the petitioner has been reversed or vacated; and (2) The petitioner has proven by clear and convincing scientific or non-scientific evidence that he is factually innocent of the crime for which he was convicted.
B. For the purposes of this Section, “factual innocence” means that the petitioner did not- commit the crime for which he was convicted and incarcerated nor did he commit any crime based upon the same set of facts used in his original conviction.
C. All- petitions for compensation as provided'in.this Section shall be filed in the district court in which the original conviction was obtained, hereinafter referred to as “the court”, and shall be governed by procedures outlined herein and randomly re-allotted by the court.
D. The court shall render a final decision on all petitions for compensation filed in accordance with the provisions of this Section and shall be tried by the judge alone. The court may consider any relevant evidence regardless of whether it was admissible in, or excluded from, the criminal trial in which the petitioner was convicted. (Emphasis added.)
In accordance with the statute, the case was randomly ré-allotted to Judge Katherine Clark Dorroh. The Attorney General’s Office (hereinafter |athe “State”)[2] filed an opposition, arguing that Ford was not “factually innocent,” as required by the statute, because he committed other crimes based on the same set of facts used *1246 in his original conviction. After Ford filed a reply and the state filed a sur-reply, the trial court held a hearing on February 5, 2015. Ford was personally present at the hearing a.nd did not testify. Ford offered all of the exhibits attached to his filings into evidence, and the state, without opposition, offered the complete record of the underlying criminal case. into, evidence. Following arguments, the trial court took the matter under advisement.
On March 27, 2015, the trial court denied Ford’s petition for compensation. The court found that although Ford established that his conviction was vacated, he failed to prove that he was factually innocent. The trial judge concluded that Ford committed several other crimes and his involvement in the underlying offense.was undeniable. Specifically, the trial judge found that the evidence presented at the murder trial established that Ford committed, at .a minimum, the crimes of possession of stolen things and accessory after the fact to armed robbery. In her thoughtful and thorough written opinion, the trial judge enumerated the evidence that established the elements of each of those crimes. In addition, the trial judge concluded that Ford was also a principal to the armed robbery.
This matter was originally brought before this court by Ford as a request for supervisory review of the denial of his petition for compensation. Finding that the denial of wrongful conviction compensation is in the nature b of a final judgment on a demand for the payment of a sum of money and is quasi-civil in nature, this court, on July 2, 2015, remanded for perfection as a civil appeal.[3]
This court was subsequently made aware that Ford died on June 29, 2015. As noted, following argument on appeal, the executrix of the estate of Ford was substituted as the petitioner herein for the deceased Ford. See fn. 1, supra.
DISCUSSION
Ford presents one assignment of error, namely, that the trial judge erred in denying his petition for compensation. He argues that the state’s position is disingenuous in that the state was the party who moved to vacate his conviction and now *1247 attempts to deny him compensation for ■wrongful conviction. A theme throughout Ford’s filings is his entitlement to compensation because of the egregious nature of his conviction and | ¡¡suffering on death row. Substantively, Ford .argues that the trial judge (1) misapplied the statute, and (2) ignored the requirement of a just and equitable outcome in a case, of grave injustice.
The state maintains that Ford failed to prove by clear and convincing evidence that he is factually innocent, as required by the statute. 1 The state further' asserts that the trial court can deny compensation without the state proving any fact — rather, the entire burden is on Ford to prove that he did not commit any crime based upon the same- set of facts used in the original conviction. According to the state, Ford failed to meet this' burden and, thus, the trial judge was correct in concluding that his commission of the crimes of possession of stolen things, accessory after the' fact and being a principal to the underlying offense of armed robbery precludes recovery under the statute.

Standard of Review

A careful reading of the statute leads this court to conclude that great weight must be accorded the findings of the trier of fact. Indeed, in the recent case of Burrell and Graham v. State of Louisiana, 50,157 and 50,158 (La.App.2d Cir.1/13/16), 184 So.3d 246, this court held that our review of such findings in a wrongful conviction compensation case is governed by the manifest error standard. Under this standard, the trial court’s factual findings will not be disturbed unless they are plainly wrong or manifestly erroneous. La. Const. Art. V, § 10; Moreland v. Gungor, 49,671 (La.App.2d Cir.4/15/15), 163 So.3d 825; Wooley v. Lucksinger, 2009-0571 (La.4/1/11), 61 So.3d 507. A determination of fact is entitled to great deference on review. Id,-, McGlothlin v. Christus St. Patrick Hosp., 2010-2775 (La. two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or plainly wrong. Khammash v. Clark, 2013-1564 (La.5/7/14), 145 So.3d 246; Rosell v. ESCO, 549 So.2d 840 (La.1989). The issue is not whether the trial court’s findings are right or wrong, but whether they are reasonable on the record as a whole. Broussard v. State, 2012-1238 (La.4/5/13), 113 So.3d 175; |7/1/1 l),fi 65 So.3d 1218. When there are Rosell v. ESCO, supra.[4]

Burden of Proof, Evidence Considered, and Meaning of “any crime”

Considerations of the burden of proof and what evidence might be considered by the trier of fact in the compensation proceeding and, thus, in this appeal .are actually not before us, notwithstanding the argument of counsel for Ford. This court functions only as the expositor of the clear *1248 statutory language expressing the will of the citizens as expressed by their legislators. There is nothing vague about the substantive elements of the subject statute. To the contrary, its language is precise despite the arguments that the burden of proof upon the former prisoner is unwarranted or that evidence supporting a conviction of other crimes based on the record should not be considered.
|7It is clear from a reading of the statute that the burden of proof in this case is on the petitioner. Ford must prove his factual innocence by clear and convincing evidence. See In Re Williams, 2007-1380 (La.App. 1st Cir.2/20/08), 984 So.2d 789. This intermediate standard of “clear and convincing” means more than a “preponderance,” but less than “beyond a reasonable doubt.” Burrell v. State, .supra, citing Mulkey v. Mulkey, 2012-2709 (La.5/7/13), 118 So.3d 357. Under the clear and convincing standard, the existence of the disputed fact must be highly probable or much more probable than its nonexistence. Id. In the case sub judice, the state has expressed that Ford is factually innocent of first degree murder, but, in order to receive compensation, Ford must prove that it is highly probable that he did not commit “any crime based upon the same set of facts used in his original conviction.” La. R.S. 15:572.8(B). In Burrell and. Graham, supra, we explained the burden of proof in a wrongful conviction compensation case:
[A] petitioner must prove by clear and convincing evidence, scientific or not, that he is “factually innocent,” i.e., that he did not commit the crime for which he was convicted or any crime based on the same set of facts used in that conviction. It is plainly evident that more is required to receive compensation than simply showing a conviction has been vacated. Implicit in the inclusion of the second prong of this burden is the intent of the legislature that not every matter in which post-conviction relief is granted will also be a matter in which compensation is awarded.
The statute is also clear that the “court may consider any relevant evidence regardless of whether it was admissible in, or excluded from, the criminal trial in which the petitioner was convicted.” La. R.S. 15:572.8(D); In Re Williams, supra. The evidence considered by the trial judge in this | Scase included the entire record of the proceedings in the first degree murder proceeding — not only the first degree murder trial transcript, but also proceedings related to, inter alia, Ford’s motion to suppress statements made to police, preliminary examination and sentencing. According to Ford, however, the trial .judge erred in considering evidence/facts that were not admitted at the trial. Specifically, Ford complains that the trial judge erred in considering a statement made by Ford to police during the investigation that was excluded from trial by motion to suppress. Ford submits that such facts/statements were not “used in his original conviction.” La. R.S. 15:572.8(B). He further suggests that the evidentiary limitation to only that evidence that was “used in his original conviction” is paramount. Ford suggests that the broad evidentiary provision of subsection (D) allows the trial court to consider additional evidence (other than that presented at .trial) only to prove the exoneree’s innocence of the crime for which he was convicted — not as proof that he committed other crimes that would preclude compensation. We disagree,
The unambiguous language of subsection (D) indicates that the trial court is not constrained to a sterile examination of the testimony presented at the initial trial as it appears in the record. Based on the clear statutory language, the entirety of the evidence, whether, admitted at the un *1249 derlying trial or excluded, is properly considered in the determination of factual innocence, which, in this case, is the question of whether Ford proved by clear and convincing evidence ;that he did not commit “any crime based upon the same set of facts used in.his original conviction.” We further note that the entire state court criminal proceeding, a CD containing 34 volumes of |arecord, was introduced in the compensation proceeding by the attorney general — mthout objection from defense counsel .
Ford buttresses his argument regarding the limitation of evidence to be considered by urging that the statute lacks guidance regarding its “any crime” provision. He also points to the absence of any consideration of the severity of the crimes or sentencing exposure therefor in the statute. A tone exists’ in'the written and oral argument by petitioner that the subject Louisiana statute is draconian. A contention is inferred from petitioner’s argument that simply because the murder conviction was set aside that instant liability is" borne by the State of Louisiana. This is incorrect. We do not address whether our statute is exemplary; that is not our constitutional function. Indeed, our legislature might seek to amend it at some point, e.g. by providing more clarity as to procedural considerations. It is not inappropriate for us, however, to briefly reference the laws of other jurisdictions as a point of emphasis that, we apply only the Louisiana statute to the facts at hand and with no other consideration,
Louisiana is one of only 27 states along with the District of Columbia that even has such a prisoner compensation statute. The argument that Louisiana’s statute is inherently unfair is misplaced and misleading, especially when comparison is made to the other jurisdictions that have analogous statutes. Some states have a higher compensation rate," .while others have a lower rate. Notably, the vast majority[5] of jurisdictions require that the prisoner carry, the burden of proving noninvolvement in other 11flcriminal activity involving the facts from which the original conviction emanated.
Louisiana’s wrongful conviction compensation statute requires that a petitioner prove his factual innocence of “any crime based upon the same set of facts used in his original conviction.” La. R.S. 15:572.8(B)., A review of other states’ wrongful conviction compensation statutes reveals that the most prevalent expression of a similar element of the action is that the petitioner did not commit any “lesser and included” offense and that no proceedings can or will be brought against him on any facts and circumstances alleged in the proceedings which resulted in the conviction. For example, the Oklahoma wrongful conviction compensation statute provides that in order for a petitioner to receive compensation, the following must occur:
(2) in the case of judicial relief [for wrongful conviction], a court of competent jurisdiction found by clear and convincing evidence that the offense for which the individual was convicted, sen.tenced and imprisoned, including my lesser included offenses, was not committed by the individual and issued an order vacating, dismissing or reversing the conviction and sentence and providing that no further proceedings can be or will be held against the individual on any facts and circumstances. alleged in the proceedings which had resulted in the conviction.
*1250 51 Okl. St. Ann. § 154 (Emphasis -added); See, e.g„ I.G.A. § 663A.1.
■ While there is not an abundance of jurisprudence applying this particular requirement of proof, the courts in Ohio have consistently interpreted a similar provision in that state’s wrongful conviction compensation statute. In Gover v. State, 67 Ohio St.3d 93, 616 N.E.2d 207 (1993), the supreme court of Ohio explained the burden of proof. The Ohio |ucourt found that burden to be “of critical importance” because:
This statutory language is intended to filter out those claimants who have had their convictions reversed, but were committing a different offense at the time that they were ■ engaging in the activity for which they were initially charged. When the General Assembly enacted Ohio’s wrongful imprisonment legislation, it “intended that the court of common pleas actively separate those who were wrongfully imprisoned from those who have merely avoided criminal liability.” ... [Claimants seeking compensation ■ for wrongful imprisonment must prove that at the time of the incident for which they were initially charged, they were not engaging in any other criminal conduct arising out of the incident'for which they were initially charged. (Internal citations omitted.)
We believe our legislature in enacting La. R.S. 15:572.8 had the same intent as the Ohio legislature, and we construe the phraseology in oür ' statute, “any crime based upon the same set of facts used in his original conviction,” in a like manner. Ford bore the burden of disproving involvement in any crime arising from the circumstances that led to his conviction- of first degree murder.
No consideration may be given to the relative insignificance of another crime vis-a-vis first degree murder. The legislature has declared that if a petitioner committed “any crime” based upon the same set of facts used in his original conviction the petitioner is not entitled to compensation. Although the more stringent burden of proof of clear and convincing rests on the petitioner to prove a negative, it is not our function to ignore the legislature’s clear intent.

Did Ford Prove his Factual Innocence by Clear and Convincing Evidence?

As previously stated, on' February 5, 2015, a hearing was conducted on Ford’s petition for compensation. ' The court heard argument of counsel 112and accepted exhibits, including the 34-volume record of the criminal proceeding, and the matter was submitted on briefs.
Ford did not produce any evidence in addition to that which is contained in the record of the criminal proceeding and the motion to vacate his conviction and sentence. Rather, Ford relied on argument of counsel .and the somewhat confusing notion advanced by his counsel that the state, failed to prove , at his first, degree murder trial that Ford was also guilty of other crimes that .would, eventually, preclude his receiving the compensation he now. seeks. Nonetheless, we. will review the evidence that was before the trial judge stemming.from the murder trial and apply the manifest error standard to her findings; Burrell v. State, supra..
The evidence adduced at the first degree murder trial of Ford was succinctly stated in the Louisiana Supreme Court’s opinion affirming his conviction and sentence and is reproduced here, in pertinent part:
On November 5, 1983 Dr. A.R. Ebra-him called on Mr. Rozéman 'at the latter’s home and antique watch repair shop. ' Finding the front door ajar and the shop ransacked, and unable to find Mr. Rozeman, Dr. Ebrahim went next door and called police.
*1251 Officer Skaggs arrived within minutes to discover Mr. Rozeman lying behind a display cabinet, lifeless and bleeding from a .38 caliber gunshot wound to the head. Next to the body lay a partially filled duffel bag, pierced by the fatal bullet, with powder burns on one side and blood on the other. A paper grocery bag, crumpled as if used as a glove, was also found at the scene. The shop display cases had been emptied of watches and other jewelry; Mr. Roze-man’s pockets were turned inside-out. There appeared to have been no struggle.
The police questioned Dr. Ebrahim and immediately canvassed the neighborhood. Dr. Ebrahim had spoken to Mr. Rozeman, he said, at approximately 2:30 p.m. and had arranged to meet him later that afternoon. Heidi and Spring James, two young neighbors of Mr. Rozeman, had seen Mr. Rozeman’s 11syardman in :an alley adjacent to his property at approximately noon. Another neighbor placed the yardman in the vicinity at between 1:30 and 2:00 p.m. A third neighbor identified Mr. Rozeman’s yardman as Glenn Ford, and the police put out word he was wanted for questioning.
Ford appeared at the police station accompanied by his father at 2:00 o’clock the following morning, and voluntarily recounted his day’s events. The night of the 4th he stayed with Chris Johnson and Rickey Deming at Johnson’s apartment. He arose the morning of the murder and went with Johnson to catch a bus and do some shopping. When the bus had not arrived by 11:00 a.m. as scheduled, they returned toward home. Ford saw an acquaintance, whom he could or would identify only as “O.B.,” and with him proceeded to Mr. Roze-man’s neighborhood. Together they went to the Keep Happy, Grocery, then to Mama Mia’s Pizzeria, where a beer salesman gave them each a beer. Ford next went alone to speak with Mr. Roze-man, at about 1:20 p.m., seeking either work or an advance in pay. Advised that Mr. Rozeman had nothing for him to do and could not extend him an advance, Ford left Rozeman’s shop. He urinated in the alley, rejoined his companion briefly, and then caught a ride with Clarence Pouncey and Alvin White to his girl friend’s house. Finding no one at home, Ford proceeded to a nearby housing project, where he watched a dice game. He' returned to his own apartment at about 3:30 p.m. and remained there for the rest of the evening.
In response to police questioning, Ford denied owning a gun or having recently fired one'. While at the station Ford consented to be photographed and submitted to fingerprinting and a gunshot residue test. He also consented to a search of his apartment, which turned up nothing.- He and his father Were allowed to leave at 5:00 a.m. and went out to breakfast: The pólice proceeded to verify the particulars of Ford’s statement. They spoke with Deming, who confirmed that Ford had spent the night at Johnson’s apartment. From him the police also learned that Ford had discussed purchasing a handgun. They spoke with Pouncey and White who acknowledged giving Ford a ride. From them the police also learned that Ford had attempted to sell a handgun that afternoon. Ford was sought out for further questioning.
Ford agreed to give a second statement, in which he again maintained he' did not own a gun, but admitted to trying to sell one on behalf of “O.B.” Police again allowed him to leave.
Ford was arrested after pawn shop receipts revealed he 114had sold jewelry, similar to that taken from Mr. Roze-man’s shop, shortly after the murder. *1252 In his third statement given police, on November 8th, he said he received these items from “O.B.” and pawned them at his request. The following day police searched Ford’s apartment a second time. On this occasion they found demitasse spoons, a cross, gold chains, a pill box and shirt studs, all similar to items customarily sold by Mr. Rozeman.
On November 11th Ford gave a fourth statement, implicating Henry and Jake Robinson in the murder. Henry Robinson was apprehended in California; a search of his luggage turned up a shirt stud matching those found in Ford’s room. In his fifth statement, given on November 13th, Ford identified Henry “Nirobi” Robinson as “O.B.” He further stated that the Robinson brothers had told him of their plan to rob Mr. Rozeman and asked him to join them, but that he declined to do so. He indicated he was fearful of the Robinsons and the police agreed not to use this statement in court.
In January of 1984, Donnie Thomas, a co-defendant’s brother-in-law and Ford’s cellmate, related to police that Ford had discussed with him the details of the robbery and murder. According to him, Ford was able to gain access to Mr. Rozeman’s shop because he was recognized by his employer.
⅜ ⅜ ⅜
In February police interviewed Mar-vella Brown, Jake Robinson’s girl friend. She stated that Ford arrived at her apartment around noon the day of the offense, and asked the Robinsons, “Is you still going?” The three left, she said, returning around 3:00 p.m. with a sack containing jewelry. Ford carried a .22 pistol, and Jake Robinson had a .38.
Ford was charged with first degree murder on February 9,1984.
⅜ ⅜ ⅜
Trial commenced on November 26, 1984. The defense was alibi; the defendant did not testify. His first two statements were introduced into evidence by the prosecution, and he attempted thereafter to introduce the third, in which he had explained to police that he pawned the jewelry for “O.B.” The state objected, and the evidence was not allowed. The jury was charged on December 5, 1984 and returned their unanimous verdict on the guilt phase in just under three hours.
Our review of the first degree murder trial transcript confirms the | ^Supreme Court’s account. In addition, and more specifically, the testimony of Heidi James, Chandra Nash, Joseph Nash and James Spring placed Ford at or near Mr. Roze-man’s house on the day of the robbery and murder. Ms. James testified that she saw Ford walking “kinda weird” in the alley before the ambulance arrived to pick up Mr. Rozeman’s body. Ms. Nash testified that she saw Ford and two other black males in the alley behind Mr. Rozeman’s house the Monday following the robbery and murder.
Jake Robinson’s girlfriend, Marvella Brown also testified at trial.[6] She stated that Ford (who she called “Long Hair”) was at her house the evening of the crime. Ford asked the Robinsons “if they were going,” or “are we going?” Ms. Brown then testified that she saw the three men together a few hours later. She then stated that she saw Ford with a gun, that was not a .22 caliber. Ms. Brown then related that Jake Robinson showed her items of *1253 jewelry and a pocket watch and let her. keep two of the rings, which she said she “was hiding” after she found out Mr. Roze-man was dead.
Alvin White and Clarence Pouncy each testified at trial that Ford approached them after the robbery and murder about purchasing a .38 pistol. Richard Beighley, accepted as an expert in the examination of firearms and bullets, testified that a recovered bullet was consistent with a .38 caliber gun.
The pawn tickets dated the day of the robbery and murder were introduced at trial and handwriting exemplars matched Ford’s signature. [ir,Detective Gary Aider-man testified that a search warrant executed on Ford’s hotel room produced an antique spoon, gold chain, cufflink and four studs, which bore the same markings as studs found in a bag belonging to Henry Robinson. Richard Moore, an employee of the pawn shop, identified Ford as the individual who sold certain items (determined to have been from Mr. Rozeman’s shop) at 5:00 p.m. on the day of the robbery and murder.
Alice Smith, Ford’s landlord, also testified. On the morning of the robbery and murder, Ford advised Ms. Smith that he would be able to pay her rent later that day. Sometime in the late afternoon, Ford brought the rent to Ms. Smith.
During closing arguments, in an effort to show that Ford was not the shooter, defense counsel acknowledged that Ford tried to sell a gun and that he pawned items stolen from Mr. Rozeman’s shop.
At the sentencing hearing, Ford testified, denying he killed Mr. Rozeman and knowing who committed the murder. Ford did not deny being with the other perpetrators of the crime, either before or after the murder; he did not deny being at Mr. Rozeman’s shop at the time of the murder/robbery; he did not deny attempting to sell a .38 caliber pistol; he did not deny pawning items taken in the robbery. When asked if he had anything to say to the jury he stated, “I’m not guilty of first degree murder, and I’m not a killer, I’m not cold-blooded ... I wasn’t in no kind of criminal activity whatsoever — well, not to my knowledge.” (Emphasis added.) Ford then told the jury that he did not commit 52 prior burglaries to which he pled guilty. While these prior burglaries were not associated with the Rozeman murder case, Ford’s denial of them may well have demolished his I ^credibility.[7]
More importantly, at the instant compensation hearing, Ford did not refute or explain these assertions. The petitioner’s failure to testify at the compensation hearing is glaringly significant. Indeed, an adverse presumption exists when a party having control of a favorable witness fails to call him or her to testify. Driscoll v. Stucker, 2004-0589 (La.1/19/05), 893 So.2d 32; Easter v. Direct Ins. Co., 42,178 (La.App.2d Cir.5/9/07), 957 So.2d 323. We conclude that Ford’s failure to testify, and potentially explain that he was not involved in other criminal activity on the day of the murder, and for some time before and after it, corroborates Ford’s actual commission of other crimes. Ford had no *1254 privilege against testifying, constitutional or statutory. Ford simply chose not to speak.- The trial court’s findings that Ford committed other crimes, as delineated in the subject statute, determined correct and as amplified by this court, are confirmed by Ford’s resounding silence at the compensation hearing.
In addition, at the hearing on the motion to suppress the statements of Ford; Detective Gary Pittman testified that Ford admitted to him that he and O.B.[8] had been at Mr. Rozeman’s house on the day of the murder and that O.B. had asked him about selling a gun. Detective Ashley also testified that Ford told him that he had spoken with two potential buyers about the .38 that | iaO.B. had asked him to sell.
Detective Ashley further testified that a neighbor of Mr. Rozeman’s had told investigating officers that he had seen Ford and Mr. Rozeman having a discussion a few days before the murder and that Ford appeared to have been upset over a debt related to the lawn mowing service. Detective Ashley confirmed that there were several, witnesses who placed Ford within one city block of Mr. Rozeman’s house on the day of the murder. He further testified that Ford had stated that O.B. had also asked him to sell items connected to the robbery — which Ford then sold to the International Pawn Shop. Ford advised Detective Ashley that he sold the items to the pawn shop at approximately 5:00 p.m., just two hours after Mr. Rozeman’s body was found.
• The trial judge properly found that Ford failed to disprove that he committed the crimes of possession of stolen goods, accessory after the fact and being a principal to the armed robbery. We cannot say that these findings are manifestly erroneous given the overwhelming evidence of Ford’s knowledge of and involvement in the criminal activity that day and night: his participation in selling the stolen property from the robbery; his acting as a lookout; meeting with Jake Robinson and Henry Robinson before and after the crime; and his attempts to procure buyers for the probable murder weapon.

Illegal Possession of Stolen Things

At the time of trial, illegal possession of stolen things was defined as:
the intentional possessing, procuring, receiving, or concealing of anything of value which as been the subject of any robbery or theft, under circumstances which indicate that the offender 11flknew or had good reason to believe that the thing was the subject of one of these offenses.
La. R.S. 14:69(A)(1983).
The testimony of Ms. Brown that Ford was with the Robinsons prior to the robbery and murder and asked if the three “were going to go,” coupled with his presence at Mr. Rozeman’s on the day of the crime and activity around the shop, could be construed as “casing” the shop. These actions could easily be construed as showing Ford’s knowledge of the planned crime.
The evidence clearly establishes that Ford took the stolen items and sold them-at the pawn shop. Ford’s argument that there is no evidence as to how he came into possession of the items is without foundation. There is no manifest error in the trial judge’s determination that Ford failed to prove ' by clear and ’ convincing evidence that he was not in illegal possession of stolen things.'

Accessory after the Fact

At the time of the offense, accessory after the fact was defined as
any person who, after the commission of a felony, shall harbor, conceal, or aid the offender, knowing or having reasonable *1255 ground to believe that he has committed the felony, and with the intent that he may avoid or escape from arrest, trial, conviction or.punishment.
La. R.S. 14:25 (1983).
Again, Ford was aware of 'the plan to rob Mr. Rozeman. He agreed to sell some of the stolen items in his name, which he did. Ford also agreed to procure buyers for the .38 caliber pistol. In her written reasons, the trial judge concluded that the evidence “clearly established” that Ford was trying to help the Robinsons avoid arrest. Accessory after the fact,'which— in this 12ncase concealed the identity of murderers — may well be the type of crime which the legislature contemplated as a crime unworthy of compensation. She stated that Ford’s “willingness and ' attempts to find a buyer for the weapon used in the crime” added to the fact that he was assisting the. Robinsons. These conclusions are well supported by the record and we agree with the trial judge that Ford’s assertion that he did not know the items were stolen is unbelievable. We find no manifest error in the finding that Ford failed to carry his burden of disproving his commission of accessory after the fact.

Principal to Armed Robbery

At the time of the offense, La. 14:24 provided that:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
Ford argues that in order to find that he was a principal to the armed robbery, the trial judge would have had to rely on his statement to officers that was excluded from the trial: This statement regarded the fact that Henry Éobinson had told Ford of the plan to rob Mr. Rozeman. Ford dlso emphasizes the state’s assertion; in its motion tt> vacate, thát he was “neither present nor a participant in the robbery and murder' o'f Tsadore Rozeman.” First, the overwhelming evidence in' the record before us supports the conclusion that Ford was concerned1 in the commission of this crime. Despite his purported absence, Ford aided in its commission in several respects. The statement of the district attorney is not evidence, nor has Ford produced any-evidence that he was not concerned in the commission of this 1⅞1 crime. We find no mahifest error in the trial judge’s conclusion regarding Ford as a principal to this crime.

Criminal Conspiracy

In addition to the other crimes possibly committed by Ford “based upon the same set of facts used in his original conviction,” as found by the trial judge, the evidence also supports a finding that Ford was engaged in a criminal conspiracy. - At the time of the offense, La. R.S. 14:26 provided in pertinent part as follows:
A. Criminal conspiracy is the agreement or combination of two or more persons for the specific purpose of committing any crime; provided that an agreement or combination to commit a crime shall not amount to a criminal conspiracy unless, in addition to' such agreement or combination, one or more of such parties does an act in furtherance of the object of the agreement or combination.[9]
*1256 As outlined in this opinion, the uncontro-verted evidence shows that Ford knew of the plan to rob Mr. Rozeman and committed an act in furtherance of the crime by his presence around the shop prior to and after the crime and agreeing to sell the stolen items and murder weapon. Thus, we conclude that the trial judge could have found that Ford committed criminal conspiracy. Yet, Ford presented no evidence whatsoever to rebut such a finding.
We find no manifest error in the trial judge’s conclusion that Ford | ^failed to prove by clear and convincing evidence that he did not commit any crime based upon the facts used in his conviction, as required by La. R.S. 15:572.8. Therefore, the trial court was clearly correct in finding that Ford is not entitled to. compensation for wrongful conviction under the subject statute.
As a final note, in light of our holding that Ford is not entitled to compensation, we pretermit any discussion of the heritability of the wrongful conviction compensation cause of action.
CONCLUSION
For the foregoing reasons, the judgment of the trial court' denying the petition of Glenn Ford, through Andrea Armstrong, the executrix of the estate of Glenn Ford, for compensation under La. R.S. 15:572.8 is affirmed at the cost of petitioner/appellant.
AFFIRMED.
MOORE, J., concurs with written reasons.

. Ford died on June 29, 2015, after this appeal was perfected. There was discussion by this court as to compliance with the provisions of La. C.C.P. art. 801 and the court considered noticing an exception of no right of action on its own motion. However, after *1245 oral argument, counsel for Ford filed in the district court an unopposed motion'to. substitute parties pursuant to La. C.C.P. art.. 801. The motion was denied for lack of jurisdiction due to the pendency of the appeal. Counsel for Ford then requested leave to file the same motion in this court. While we note that the district court could likely have ruled on this motion under La. C.C.P. art. 2088, in the interest of judicial economy, this court subsequently granted the Article- 801 motion allowing substitution of Andrea Armstrong, executrix of the estate of Glenn Ford, as the petitioner.

. La. R.S. 15:572.8(E) provides that the attorney general shall represent the state in proceedings involving petitions for compensation.

. The Supreme Court has stated that La. R.S. 15:572,8 is sui generis and governs a unique situation. Burge v. State, 2010-2229 (La.2/11/11), 54 So.3d 1110. Regarding the nature of an action under the statute, we explained in Burrell and Graham v. State of Louisiana, 50,157 and 50,158 (La.App.2d Cir.1/13/16), 184 So.3d 246, that the original intent of the legislature in drafting the compensation statute was for the procedure to be administrative in nature, to be "governed by the Louisiana Administrative Procedure Act, with an application for compensation to be filed with the Board of Pardons: House Bill No. 663; Act 486 of 2005 Regular Legislative Session. When the statute was ultimately enacted in 2005, the statute required applications to be filed in the 19th Judicial District Court and allotted to the civil division. In . 2007, the statute, was amended to change "application” to "petition” with the requirement that the action be filed in the district court in which the conviction was obtained. The statute does not specify whether the action is to be filed in the criminal or civil division of the district court.
Pursuant to the instructions of this court in its ruling on the writ application, as well as the request of counsel for guidance in this proceeding as to the procedural mechanism, we find that these proceedings are primarily civil in nature. The statute gives little guidance in Section C, There are no specific procedures mentioned other than that the rules of evidence apply. While the statute requires that the action be filed in the district court from which the conviction emanated, again, there is no requirement that the petition be filed in the criminal, rather than the civil division. Significantly, the burden of proof of clear and convincing evidence is on the petitioner seeking compensation, a variation of a petition for damages as would appear in- civil proceedings.

. This court does not engage in a strained myopic analysis of the testimony and ignore the jury’s findings. Any trier of fact, judge or jury, while observing the testimony of a witness can perceive clear pictures of truth and deceit. Words and demeanor can mean totally different things depending in large part on he who speaks and he who observes and listens. Transcripts can in some instances provide clarity; these also can provide confusion and misleading" implications. The judge or jury can determine whether the witness is one who seemingly is attempting to impress and receive a desired result or is verily providing a candid response while genuinely honoring his oath. Triers of fact are charged with the responsibility 'of determining truth based on their reasonable perceptions. The oath and conscientiousness of the fact finder to reach a just conclusion should never be overlooked. Hence, where there is a reasonable basis for the conclusion of the trier of fact, such conclusion is not manifestly erroneous or clearly wrong. Moreland v. Gungor, supra, and cases citedíherein., .

. Only California recognizes compensation on a finding of actual innocence of only the underlying conviction. Cal.Penal Code § 4900.

. Ms. Brown later, in the penalty phase of the proceedings, recanted her testimony and stated that she had lied in her previous testimony.

. The trial jury's unanimous finding that the maximum penalty should be imposed could be based upon a number of considerations. However, Ford’s testimony at the penalty phase of the underlying trial, that he did not murder Mr. Rozeman and, basically, that he was not involved in other crimes, coupled with the jury’s finding, could reasonably lead to the conclusion that the jury simply did not believe Ford or find him credible. The jury’s finding, possibly based on his demeanor as a witness, which cannot be determined from reading the transcript, is yet another consideration of Ford’s having committed “other crimes” in the context of the subject statute. See fn. 4, supra.

. The record shows that '‘O.B.” was a phantom designation of Henry Robinson.

. As an aside, while not a consideration under the wrongful conviction compensation statute, we note that the penalty for criminal conspiracy is as follows:
C. Whoever is a party to a criminal conspiracy to commit any crime shall be fined or imprisoned, or both, in the same manner as for the offense contemplated by the conspirators; provided, however, whoever is a *1256 party to a criminal conspiracy to commit a crime punishable by death or life imprisonment shall be imprisoned at hard labor for not more than thirty years.