| STATE OF LOUISIANA | * | NO. 2020-K-0412 |
| --- | --- | --- |
| VERSUS | * | |
| | | COURT OF APPEAL |
| DARRILL HENRY | * | |
| | | FOURTH CIRCUIT |
| | * | |
| | | STATE OF LOUISIANA |

\* \* \* \* \* \* \*

APPLICATION FOR WRITS DIRECTED TO
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 451-696, SECTION "G"
Honorable Dennis J. Waldron, Judge
\* \* \* \* \* \*
**Judge Dale N. Atkins**
\* \* \* \* \* \*
(Court composed of Judge Terri F. Love, Judge Daniel L. Dysart, Judge Dale N.
Atkins)

**LOVE, J., CONCURS.**

Leon Cannizzaro
DISTRICT ATTORNEY
ORLEANS PARISH
Donna Andrieu
CHIEF OF APPEALS
ORLEANS PARISH
Irena Zajickova
ASSISTANT DISTRICT ATTORNEY
619 South White Street
New Orleans, LA 70119


      COUNSEL FOR RELATOR


Letty S. Di Guilio
LAW OFFICE OF LETTY S. DI GIULIO
1055 St. Charles Avenue,
Suite 208
New Orleans, LA 70130

Vanessa Potkin
INNOCENCE PROJECT, INC.
40 Worth Street, Suite 701
New York, NY 10013

Aaron Delaney
Ariane Rockoff-Kirk
Daniel R. Friel
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
*Pro Hac Vice*

COUNSEL FOR RESPONDENT

**WRIT GRANTED, RELIEF DENIED; REMANDED**
**OCTOBER 29, 2020**

*DNA*
*DLD*

Relator, the State of Louisiana, seeks supervisory review of the district court's July 29, 2020 judgment, granting the application for post-conviction relief of Respondent, Darrill Henry, vacating Respondent's convictions for first degree murder, and ordering a new trial. For the following reasons, we grant the State's writ application, but deny relief, finding that the district court did not abuse its discretion. We remand this matter for further proceedings.

### FACTUAL AND PROCEDURAL BACKGROUND

At approximately 1:30 p.m. on June 15, 2004, eighty-nine year-old Durelli Watts and her sixty-seven year old daughter, Ina Claire Gex, were murdered at Ms. Watts's home at 1930 Duels Street in New Orleans. The perpetrator stabbed Ms. Watts fourteen times in the face, neck, and upper chest before setting Ms. Watts's body and house on fire. Before the perpetrator could leave the house, Ms. Gex arrived to check on her mother after telephone calls to Ms. Watts from other family members went unanswered. Ms. Gex encountered the perpetrator on the porch. The perpetrator shot Ms. Gex three times and rummaged through Ms. Gex's purse before shooting her a fourth time in the head. The perpetrator then walked away from the house and down the street. Three of Ms. Watts's neighbors witnessed the

1

shooting. The witnesses removed Ms. Gex from the porch but were unable to remove Ms. Watts from the house because the house was on fire.

On September 2, 2004, Respondent was indicted on two counts of first degree murder, violations of La. R.S. 14:30. Respondent entered pleas of not guilty on September 9, 2004. After the district court denied Respondent's motions to suppress statements and identifications, Respondent's trial commenced on August 23, 2011. Respondent was convicted on both counts, and his convictions were affirmed by this Court. *See State v. Henry*, 2013-0059 (La. App. 4 Cir. 8/6/14), 147 So.3d 1143.

In this Court's August 6, 2014 Opinion in this matter, we summarized the evidence presented at Respondent's trial and noted that there was no forensic evidence presented at trial that linked Respondent to either of the victims or to the crimes. During the investigation, Ms. Watts's wallet was collected and the coroner took fingernail scrapings during her autopsy. At the time of trial, no DNA profiles were able to be developed from the wallet or the fingernail scrapings. Additionally, blood splatter from the crime scene was tested, but the DNA recovered did not inculpate anyone in the crime, as the only profiles that were developed belonged to one or both victims.

Only the eyewitness testimony from Ms. Watts's three neighbors who witnessed the shooting was presented during trial to prove Respondent's guilt. Respondent disputed the reliability of the eyewitness testimony at trial.

Cecilia Garcia testified that, at the time of the murders, she lived at 1933 Duels Street, across the street from Ms. Watts. On the day of the murders, Ms. Garcia was talking on the telephone in her kitchen at about 1:30 p.m. when she heard what sounded like a pebble hitting her house. When she went to the front of

2

her house to investigate, she saw a man standing on Ms. Watts's front porch and saw a woman in a prone position on the porch. Ms. Garcia retrieved her cell phone and went outside. She saw a man whom she did not recognize walk away from the front porch of Ms. Watts's house toward the house of her neighbors to the right. Ms. Garcia testified that she and the man passed each other on the street. The man walked in a leisurely manner, as if "taking a Sunday stroll," and wore a floppy "Gilligan" hat that "shadowed his face some," blue pants, and a red t-shirt.

Later that evening, Ms. Garcia saw a sketch of the perpetrator on television that she thought was incorrect. Ms. Garcia directed her husband to draw a more accurate sketch, which she subsequently gave to the police. On July 7, 2004, a few weeks after the murders, Ms. Garcia identified the Respondent in a six-person photographic lineup as the man she saw walking from Ms. Watts's porch on the afternoon of the murders. Ms. Garcia also identified Respondent in open court as the man she saw walking away from Ms. Watts's house after the murders.

Another of Ms. Watts's neighbors, Steven Dominick, testified that he grew up in his parents' home at 1937-39 Duels Street, which was directly across the street from Ms. Watts's house. He had known Ms. Watts his entire life. He was at his parents' house on the afternoon of the murders, when, at approximately 1:00 p.m. that afternoon, he heard gunshots coming from across the street. Mr. Dominick walked to the picture window in the front of his parents' house and saw Ms. Gex fall on the porch of Ms. Watts's house. As he stepped out of his parents' house, he witnessed a man put a gun to Ms. Gex's head and fire another shot. The then shooter casually walked from the scene toward the corner of Annette and Duels Streets and Mr. Dominick, while monitoring the shooter's movements from

inside the house, called the police. He then realized that Ms. Watts's house was on fire.

Later, after Mr. Dominick and another neighbor were transported to the Fifth District Police Station for questioning, Mr. Dominick described the shooter as being clean-shaven with a medium brown complexion and small twists in his hair. He said the perpetrator wore a red shirt, blue jeans/pants, and a canvas hat. The day after the incident, Mr. Dominick assisted a police artist in drawing a sketch of the perpetrator. The police showed Mr. Dominick two photographic lineups. Mr. Dominick was unable to make a positive identification of the perpetrator from either lineup. On July 17, 2010, over six years after the murder, Mr. Dominick was in jail after being arrested on other unrelated felony charges. He was placed in the same holding cell as Respondent. Mr. Dominick recognized the Respondent as the man who shot Ms. Gex and informed deputies.

The State also presented the testimony of Linda Gex Davis, another of Ms. Watts's neighbors who witnessed the shooting. Ms. Davis testified that she had been Ms. Watts's neighbor on Duels Street and had known her for many years. On the afternoon of the murders, she went to retrieve a telephone book from the trunk of her car and heard Ms. Watts tell someone they had better leave. Ms. Davis testified that, though there did not appear to be any trouble, she observed Ms. Watts standing in the front doorway of Ms. Watts's house speaking with a man wearing a red shirt and blue pants. The man had deep-set eyes and his hair was styled in jerri-curls. Ms. Davis testified that she went back into her house and almost immediately heard a gunshot. She then walked to her front door where she saw a woman lying on Ms. Watts's porch. Ms. Davis testified that she saw the man who had been speaking with Ms. Watts shoot the woman on the porch two times,

4

rummage through her handbag, and shoot her again. Ms. Davis called the police while continuing to watch the shooter as he walked, calmly and slowly, from Ms. Watts's front porch and exit the neighborhood via Annette Street. Ms. Davis testified that she was able to view the shooter's face as he stood on the porch while he was speaking with Ms. Watts.

Ms. Davis testified that, as the shooter walked away from Ms. Watts's house, he turned around several times to see if anyone was behind him. On September 2, 2004, almost three months after the murders, Ms. Davis gave a taped statement to the police. Ms. Davis identified Respondent as the shooter from a six-person photo lineup. During trial, Ms. Davis identified Respondent in open court as the man who she observed shoot Ms. Gex.

Regarding the identifications Ms. Davis and Ms. Garcia made of Respondent after being shown six-person photographic line-ups, it should be noted that the two photographs of Respondent that were used to compile the lineups presented to Ms. Garcia and Ms. Davis depicted the defendant wearing a red shirt. This is the same color shirt the witnesses said the shooter wore on the day of the murders. The other subjects presented in the lineups were not depicted wearing red shirts. The detective who showed the lineups explained that those pictures were the only photos of Respondent at the detective's disposal at the time he compiled the lineups. The detective denied any attempt to single out Respondent or unduly focus the witnesses' attention on Respondent.

On August 31, 2011, after trial, the jury returned a unanimous verdict of guilty on both counts. After the penalty phase of the trial, the jury recommended life sentences for the convictions. On May 24, 2012, the district court sentenced

Respondent to life imprisonment without benefit of parole, probation or suspension of sentence on both counts.

This Court affirmed Respondent's convictions and sentence, and the Louisiana Supreme Court denied review on April 10, 2015. *See Henry*, *supra*, 2013-0059, p. 1, 147 So.3d at 1145, *writ denied*, 2014-1869 (La. 4/10/15), 164 So.3d 831. The United States Supreme Court denied Respondent's petition for writ of certiorari on November 2, 2015. *See Henry v. Louisiana*, 136 S. Ct. 402, 193 L. Ed. 2d 339 (2015).

Respondent timely filed his original application for post-conviction relief on October 26, 2016. In his application, Respondent included a request to conduct additional DNA testing on Ms. Watts's wallet and fingernail scrapings. On March 6, 2017, the State filed a notice informing the district court that it had no objection to Respondent's request to conduct DNA testing on Ms. Watts's wallet and fingernail scrapings. The district court granted Respondent's request for post-conviction DNA testing on March 31, 2017.

On November 29, 2018, after receiving the results of the DNA testing, Respondent filed an amended application for post-conviction relief. Respondent argued that, because the Forensic Analytical Crime Lab (the "FACL") returned DNA results from Ms. Watts's wallet and fingernail scrapings that excluded Respondent as a contributor, he had proven "by clear and convincing evidence" that he is factually innocent of the murders for which he was convicted. Respondent asked the district court to overturn his murder convictions.

On April 5, 2019, the State filed procedural objections to Respondent's amended application for post-conviction relief, arguing that the reports from the FACL DNA testing did not establish Respondent's innocence. Respondent filed a

6

response to the State's procedural objections on May 3, 2019. On May 13, 2019, the FACL issued a second report in response to Respondent's request to re-visit Ms. Watts's fingernail scrapings.

On May 15, 2019, the district court ordered a hearing on the DNA test results prior to ruling on the State's procedural objections. The district court held the hearing on September 9-10, 2019. Respondent called Alan Keel of the FACL, who is an expert in forensic serology and DNA analysis, and the State called Anne Montgomery, an expert in DNA analysis who also testified at Respondent's trial.

Mr. Keel testified that foreign DNA is generally not present under another person's fingernails from casual contact. Instead, according to Mr. Keel, the most likely source of foreign DNA under another person's fingernails is someone with whom the person had intimate, prolonged, or violent contact. Mr. Keel testified that the original testing of the DNA under Ms. Watts's fingernails prior to Respondent's trial did not reveal any male DNA. Mr. Keel then testified that further testing of the fingernail scrapings revealed a mixture of DNA from a least three people: Ms. Watts, who was a major contributor, and "at least one male contributor." He concluded that the likelihood of Respondent as a potential DNA contributor fell within a range considered "uninterpretable." However, Mr. Keel explained that the "likelihood ratio" was one over one hundred, but favored exclusion over inclusion.

Mr. Keel said that, at Respondent's request, the FACL then conducted additional testing by cutting twelve small stains out of the fingernail scrapings and pooled them together, which detected a mixture of only two contributors: one female, which was determined to be the victim, and one male. Mr. Keel testified that Respondent was eliminated as a contributor of the DNA profile developed

7

from the fingernail scrapings. Mr. Keel stated that, based on his experience, evidence recovered under fingernails is typically probative in violent confrontational cases. He opined that "some if not all of the male DNA that was recovered" from Ms. Watts's fingernails "likely originates from her assailant" and again stated that Respondent was "absolutely excluded as the source of that DNA." Mr. Keel also tested the wallet collected at the scene of the crime. He stated that additional male DNA—which was not the same as that recovered from the fingernail scrapings—was detected on the wallet and that Respondent was again eliminated as a contributor of the DNA discovered on the wallet.

While Mr. Keel admitted on cross-examination that the DNA profile obtained from the fingernail scrapings during the second round of testing did not meet the eligibility standards of the FBI and it was not entered into the CODIS database, he stated that this did not undermine the probative value of the evidence. He noted that partial profiles, like the one he obtained in the instant case, have been used to both convict and exonerate suspects throughout the country. Mr. Keel admitted that a study conducted in Toronto, Canada concluded that nineteen percent of people had foreign DNA under their fingernails without scratching anyone. However, he stated that this was not likely in the instant case and that the most likely source of the male DNA under Watts's fingernails was her assailant.

Ms. Montgomery testified that the results of the FACL's DNA testing did not exonerate or inculpate Respondent. Ms. Montgomery did not believe that any of the male profiles detected by the FACL were necessarily that of Ms. Watts's assailant. She also characterized the DNA sample obtained in this case as minute and degraded. Ms. Montgomery noted that the coroner's report described Ms. Watts's nails as "long and brown and dirty." Ms. Montgomery testified that this

could suggest that Ms. Watts was not cleaning her nails "fastidiously," which could mean that trace DNA from other individuals that were not Ms. Watts's assailant could be collected under her fingernails. Ms. Montgomery further noted that Ms. Watts did not have defensive wounds to suggest that there was a struggle with her assailant, thus it would be less likely to find the perpetrator's DNA under her nails. Ms. Montgomery opined that it was possible that the male DNA came from casual contact days before the murder. Ms. Montgomery stated that the DNA found from the fingernail scrapings was minute and if the DNA had belonged to the perpetrator, she would "expect to see a fuller profile and less degradation."

On cross-examination, Ms. Montgomery admitted that the "dirt" under Watts's fingernails could have possibly been caused by soot from the fire set by the perpetrator. Ms. Montgomery also testified on cross-examination that a victim could scratch an assailant and not have defensive wounds. Regarding the degradation of the DNA profile, Ms. Montgomery conceded that the degradation could have resulted from the passage of time in storage between the collection and the testing of the DNA. Ms. Montgomery admitted that she did not have experience with the probabilistic genotyping software program used to analyze the DNA evidence in this case.

Regarding the DNA profile collected from Ms. Watts's wallet, Ms. Montgomery stated that she did not believe the unknown male DNA profile detected on Ms. Watts's wallet was from the perpetrator of the crime. Ms. Montgomery stated that she found it odd that a DNA profile was able to be generated from the wallet because, typically, a wallet is not a sterile item and is easily susceptible to transfer DNA. She noted that, when the FACL received the

wallet, it was "not sealed" and that the profile on the wallet excluded the victims, Ms. Watts and Ms. Gex, in addition to excluding Respondent.

Following the hearing, on December 3, 2019, both Respondent and the State filed post-hearing memoranda. On March 5, 2020, the district court heard oral arguments from counsel and took the matter under advisement. On March 11, 2020, the district court issued a judgment vacating Respondent's conviction based on the DNA evidence and ordering a new trial.

In its written reasons for judgment, the district court stated that the issue before it was "defendant's Motion for New Trial, based on newly discovered DNA evidence." The district court noted that under La. C.Cr.P. art. 851(B)(3), a new trial shall granted based on new and material evidence "if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty." The district court wrote that evidence at trial indicated there was a struggle between Ms. Watts and her assailant, and that a detective who testified at trial opined that a possible motive for the murders was robbery, meaning that the perpetrator may have handled Ms. Watts's wallet. The district court recounted that the DNA testing excluded Respondent as a contributor to any DNA recovered from the crime scene. Noting the evidentiary value of DNA evidence in general, especially in light of a case built on eyewitness testimony, the district court ultimately concluded that the "interest[s] of justice and the concept of fundamental fairness" required that a new trial be granted because it was "highly probable that the newly discovered [DNA] evidence would have produced a difference result" at Respondent's trial.

The district court stayed the proceedings on its own motion. Respondent paid the bail amount set by the district court and was released from prison. The State thereafter timely filed writs with this Court on May 8, 2020.

On July 22, 2020, this Court granted the State's writ application and vacated the trial court's ruling, finding it applied the standard for a motion for new trial set forth in La. C.Cr.P. art. 851(B)(3), not a post-conviction claim of innocence pursuant to La. C.Cr.P. art. 930.3(7). This Court thus found that the trial court erred by granting the application and ordering a new trial. *See State v. Henry*, 2020-0233, ___ So.3d ___ 2020 WL 4199683 (La. App. 4 Cir. 7/22/2020). This Court then remanded the case to the trial court to address whether the results of the DNA tests met the "more stringent standard required by La. C.Cr.P. art. 930.3(7)." *Henry*, 2020-0233, p. 5, 2020 WL 4199683, at *3.

On July 29, 2020, the trial court conducted a hearing via Zoom video conference. The trial court stated that, while it did not specifically reference La. C.Cr.P. art. 930.3(7), it was conscious that the clear and convincing standard was applicable. The trial court explained:

> [W]hat the clear and convincing evidence standard requires, that [sic] it's more than a preponderance to [sic] the evidence, the traditional measure of persuasion, but it's less than beyond a reasonable doubt, the stringent criminal standard. To prove by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable, that is much more probable than its nonexistence.

The trial court further stated that it had reviewed this Court's July 22, 2020 ruling, reviewed the testimony of the competing expert witnesses, Mr. Keel and Ms. Montgomery, and reviewed its own notes from the hearings and the provisions of La. C.Cr.P. art. 930.3(7). The district court again granted Respondent's post-conviction application. The district court stated:

11

> I believe that the clear and convincing evidence standard outlined in Article 930.3, Paragraph 7, clearly mandates that this Defendant be granted a new trial. In all the years that I have and all of the decisions I've made, I've never been as confident in a decision as the decision I've been called upon to make … once again this morning. I am aware of the heinous nature of this crime. I'm aware of these two killings, how they occurred. I'm aware of the three eyewitnesses who testified. Clearly[,] the jury that heard this case initially never had the benefit, though no one's fault … but nonetheless, they never had the opportunity to review this additional evidence that is quite quite [sic] compelling in my opinion.

The district court further explained: "I believe that it's highly probable, based on the evidence that has been newly discovered and presented before this Court, that the defendant is factually innocent of the crime for which he was convicted without his testimony and without this evidence being presented." The district court noted that he observed the experts as they testified and weighed their testimony in finding that Respondent had met his burden under La. C.C.P. art. 930.3(7). The district court then vacated Respondent's first degree murder convictions and ordered a new trial.

On July 29, 2020, the State filed its notice of intent to seek review of this ruling. The State timely filed this writ application.

## DISCUSSION

The State's sole assignment of error in the instant writ application is that the district court erred in finding that the results of the DNA testing of Ms. Watts's fingernail scrapings established by clear and convincing evidence that Respondent is factually innocent of the crimes of which he was convicted. The State argues that the district court should not have vacated Respondent's convictions and ordered a new trial based on the DNA evidence that excludes Respondent as a contributor of the male DNA profile developed from Ms. Watts's fingernails and wallet because

12

Respondent's expert DNA analyst had no reasonable basis for concluding that the DNA found under Ms. Watts's fingernails is necessarily that of her assailant.

Applications for post-conviction relief are governed by La. C.Cr.P. art. 924 *et seq*. Under La. C.Cr.P. art. 930.2, the petitioner in an application for post-conviction relief has the burden of proving that relief should be granted. La. C.Cr.P. art. 930.3 sets forth the only grounds upon which an application for post-conviction relief can be granted where, as here, the defendant was in custody after being convicted of an offense and sentenced.

The standard of review of a trial court's ruling on an application for post-conviction relief is abuse of discretion. *State v. Jones*, *unpub*., 2008-0516, 2009 WL 8684639, at *4 (La. App. 4 Cir. 2/11/09); *see also State v. Kenner*, 2004-1809, p. 4 (La. App. 4 Cir. 3/23/05), 900 So.2d 948, 951, *reversed on other grounds,* 2005-1052 (La. 12/16/05), 917 So.2d 1081 (no abuse of discretion in trial court's granting of defendant's application for post-conviction relief). "[W]hen a trial court makes findings of fact based on the weight of the testimony and the credibility of the witnesses, a reviewing court owes those findings great deference, and may not overturn those findings unless there is no evidence to support those findings." *State v. Thompson*, 2011-0915, pp. 13-14 (La. 5/8/12), 93 So.3d 553, 563 (quoting *State v. Wells*, 2008-2262, p. 4 (La. 7/6/10), 45 So.3d 577, 580).

La. C.Cr.P. art. 926.1 allows a person convicted of a felony to file an application for post-conviction relief requesting DNA testing of an unknown sample secured in relation to the offense for which he was convicted. La. C.Cr.P. art. 926.1 also sets forth the procedures and requirements of such testing. La. C.Cr.P. art. 930.3(7) provides that post-conviction relief can be granted when "[t]he results of DNA testing performed pursuant to an application granted under

Article 926.1 proves by clear and convincing evidence that the petitioner is factually innocent of the crime for which he was convicted."

The "clear and convincing standard" required under La. C.Cr.P. art. 930.3(7), requires proof by more than a preponderance but less than beyond a reasonable doubt. *State v. Cox*, 2015-0124, p. 13 (La. App. 4 Cir. 7/15/15), 174 So.3d 131, 138. "Under the 'clear and convincing' standard, the existence of the disputed fact must be highly probable or much more probable than its nonexistence." *State in Interest of A.L.D.*, 2018-1271, pp. 4-5 (La. 1/30/19), 263 So.3d 860, 863 (quoting *In re L.M.M., Jr.*, 2017-1988, p. 23, 2018 WL 3154776 at *12 (La. 6/27/18) ___So.3d___, n. 13); *see also State v. Ford,* 50,525, p. 7 (La. App. 2 Cir. 5/18/16), 193 So.3d 1242, 1248; *Burrell v. State*, 50,157, p. 11 (La. App. 2 Cir. 1/13/16), 184 So.3d 246, 253 (to receive compensation for wrongful conviction former death row inmates had to show it was "highly probable that they are factually innocent of the murders for which they were convicted").

The district court did not abuse its discretion in vacating Respondent's murder convictions and ordering a new trial. We owe great deference to the district court's findings of fact when it is based on the weight of the testimony and the credibility of witnesses. We can only overturn the district court's ruling if there is no evidence to support the district court's findings. There is ample evidence here.

As this Court previously noted, no forensic evidence was presented at trial—and indeed, still has not been presented—that links Respondent to either victim or to the crimes. Instead, both expert DNA analysts that testified before the district court acknowledged that the DNA test results excluded Respondent as a contributor for all of the forensic evidence recovered from the crime scene. Additionally, the district court noted that evidence at the original trial showed that

14

Ms. Watts engaged in a struggle with her assailant prior to her death, which supports Mr. Keel's opinion that the male DNA profile from Ms. Watts's fingernail scrapings came from Ms. Watts's assailant after she had violent contact with him.

Only eyewitness testimony was presented at trial to establish Respondent's guilt. This Court is conscious of the "problematic" identifications from the photographic lineups that were presented to Ms. Davis and Ms. Garcia in this case. The lineups presented to the witnesses depicted Respondent in the same color shirt as that which the witnesses recalled the perpetrator wearing on the day of the murders. Notably, the other subjects in the lineups were not wearing the same color shirt. *See Henry*, *supra*, 2013-0059, p. 24, 147 So.3d at 1157. Mr. Dominick's identification of Mr. Henry is likewise subject to some question as he was unable to identify the perpetrator right after the murders, but identified Respondent as the perpetrator six years after the murders and while he was in jail awaiting disposition of his own felony charges.

When making its ruling, the district court explained that it had heard both experts' testimony and weighed their testimony. The district court further explained that it found the evidence presented "quite compelling." The district court further stated that the jury did not have the opportunity to view this compelling evidence, and that it was "highly probable" Respondent is factually innocent. Given that the only forensic evidence available tends to show Respondent's innocence—and certainly does not inculpate him—we do not find that the district court abused its discretion in ruling that Respondent had demonstrated by clear and convincing evidence that he is factually innocent of the murders of Ms. Watts and Ms. Gex.

15

We are mindful of the standard of La. C.Cr.P. art. 930.3(7), which does not require that the DNA test results here conclusively exonerate Respondent, or even that Respondent's innocence be established beyond a reasonable doubt, in order for Respondent to be entitled to relief. Rather, La. C.Cr.P. art. 930.3(7) requires that Respondent prove by clear and convincing evidence that he is factually innocent of these crimes. The record supports the district court's finding that Respondent met that burden of proof. Accordingly, we do not find that the trial court abused its discretion in granting Respondent's application for post-conviction relief, vacating his convictions, and ordering a new trial.

## DECREE

For the foregoing reasons, we grant the State's writ application, but deny the State's request for relief, finding that the district court did not abuse its discretion. We remand this matter for further proceedings.

**WRIT GRANTED, RELIEF DENIED; REMANDED**